ATLANTIC COAST LINE RAILROAD COMPANY, WILMINGTON, NORTH CAROLINA, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 3816, 112779.   Promulgated September 30, 1944.

*Robert R. Faulkner, Esq.*, for the petitioner.
*L. W. Creason, Esq.*, for the respondent.

OPPER, *Judge*: These consolidated proceedings seek a redetermination of deficiencies in income tax of $14,516.43 and $4,186.58 for 1939 and 1940, respectively.

The primary outstanding issues relate (1) to the proper year of accrual of additional compensation paid in 1940 by petitioner to certain of its employees for services rendered in 1938, 1939, and 1940, under an application of the Fair Labor Standards Act; (2) to the proper accrual year of capital stock tax; and (3) to petitioner's claim for a deduction by reason of worthlessness of corporate stock and a bad debt due it.

### GENERAL FINDINGS OF FACT.

The facts stipulated are hereby found accordingly.  Those facts hereinafter appearing which are not from the stipulation are facts otherwise found from the record.

Petitioner is a corporation engaged in the business of transporting freight and passengers by railroad in intrastate and interstate commerce, operating some 5,000 miles of railroad in the southern part of the United States.  It filed its income tax returns for the years in question with the collector of internal revenue at Greensboro, North Carolina.

At all times here material it kept its books and made its income tax returns on an accrual and calendar year basis and filed consolidated income tax returns for itself and subsidiary railroad companies, including Atlanta, Birmingham & Coast Railroad Co., Rockingham Railroad Co., and Virginia & Carolina Southern Railroad Co.

## 1. Accrual of Wage Liabilities.

### FINDINGS OF FACT.

To maintain its road petitioner has ten operating divisions, each of which is divided into a number of roadway sections consisting of from two to eight men under a section foreman who is located adjacent to the track on that section. In addition there are "floating" gangs who do large special jobs. During 1938, 1939, and 1940 petitioner employed an average of over 4,000 of these maintenance of way employees. Prior to the passage of the Fair Labor Standards Act on June 25, 1938, it was the practice of petitioner to furnish section laborers with quarters, fuel, and other things without charge to the employees. Meat and groceries were sold to such employees at cost to petitioner, the latter being charged against the individual employee's wages on petitioner's books. The hourly wage generally paid was 20 cents.

At a meeting of representatives of industries affected with the administrator designated in the Fair Labor Standards Act [1] or his representative shortly prior to the effective date of the act, the latter stated that it was impossible at the time to make a basic determination of the cost of facilities furnished each employee by each industry.

On October 20, 1938, the Wage and Hour Administrator issued regulations which were published in the Federal Register on October 22, 1938, in which "reasonable cost" within the meaning of section 203 (m) was determined:

to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily furnished by him to his employees.

(a) Reasonable cost does not include a profit to the employer or to any affiliated person.

---

[1] On June 25, 1938, Congress enacted into law the Fair Labor Standards Act, the provisions of which were effective 120 days thereafter, or October 24, 1938. Such act in part provides:

206. Minimum wages; effective date

(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates

1. During the first year from the effective date of this section, not less than 25 cents an hour.

2. During the next six years from such date not less than 30 cents an hour,

* * * * * * *

The definitions section of the act, section 203 (m), provides:

"Wage" paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees.

Section 211 provides:

(a) The Administrator or his designated representatives may investigate and gather data regarding the wages, hours, and other conditions and practices of employment in any industry subject to sections 201–219 of this title, and may enter and inspect such places and such records (and make such transcriptions thereof), question such employees, and investigate such facts, conditions, practices, or matters as he may deem necessary or appropriate to determine whether any person has violated any provision of sections 201–219 of this title, or which may aid in the enforcement of the provisions of sections 201–219 of this title. * * *

(b) The reasonable cost of the company houses rented to the employee and of any other capital investments used in furnishing board, lodging or other facilities is hereby determined to be the cost of operation and maintenance including any depreciation due to wear and tear plus a reasonable allowance (not more than 5½ percent) for interest on the depreciated amount of capital invested. Capital and depreciation shall be computed pursuant to Regulations 94 of the Bureau of Internal Revenue. No cost will be recognized as reasonable which is in excess of the fair rental value of the property.

\* \* \* \* \* \* \*

The regulations further provided that "The Administrator \* \* \* may at any time notify an employer that he intends to hold a hearing to determine the reasonable cost to him of the board, lodging or other facilities customarily furnished to his employees" or that hearing would be held on appeals of either the employees or employer.

After the promulgation of the regulations and the effective date of the act, petitioner did not increase the cash hourly wage of its maintenance of way employees. It was the opinion of the management, after study and determination by its chief engineer, that the cost of the facilities furnished by petitioner to its employees was more than sufficient to account for the 5-cent increase provided by the act. The chief engineer determined that the facilities were at least equal to the 5-cent differential. The charges made for meat and groceries purchased by employees did not enter into this determination. The engineer's determination consisted of a computation worked up for the railroad as a whole and not with respect to individual men or accounts.

Petitioner knew of the existence of the act within 30 days of its passage and had seen and read the regulations promulgated thereunder about the time the act became effective.

In March or April 1939 representatives of the Wage and Hour Administrator visited the offices of petitioner and after examining its records left without making any criticism of petitioner's practice. In May 1939 two other representatives visited petitioner's office and before leaving stated to petitioner's comptroller that petitioner had violated the Fair Labor Standards Act. The comptroller asked that he be advised of the particulars, but his request was refused. Thereafter in May 1939 a bill of complaint was filed by the administrator in the District Court of the United States for the Eastern District of Virginia praying for a mandatory injunction to require petitioner to comply with the act, alleging that petitioner failed to pay its maintenance of way employees the minimum wages required, in that the amounts charged for housing and other facilities were in excess of reasonable cost; that the prices charged for meat and groceries included a profit; and that petitioner failed to keep the records required by the act. An answer was duly filed denying the allegation and challenging the constitutionality of the law. Issue was joined.

A written stipulation in settlement of the suit dated May 15, 1940, and amended May 31, 1940, provided:

Defendant will pay to each of its maintenance-of-way and structures employees, as such term is defined by the Interstate Commerce Commission, employed in the maintenance and operation of its railroad system, since October 24, 1938, a sum of money equal to the difference, if any, between the amounts of wages actually paid in cash to each such employee for his employment during the said period and the amounts each such employee would have been paid had he been compensated for his said employment at the minimum rates of pay as required by Section 6 of the Act.

It was further provided that in computing the additional compensation, if any, due each of the employees, the employees were to be credited with the minimum wage (25 cents an hour between October 25, 1938, and October 24, 1939; and 30 cents an hour thereafter) from which was to be deducted (1) taxes paid by petitioner on behalf of each employee under the Carrier's Taxing Act, the Railroad Unemployment Insurance Act, the Social Security Act, and any unemployment compensation act in any state in which petitioner operated; (2) the actual amount paid by petitioner under assignments or garnishments; (3) membership dues in petitioner's relief department; (4) amounts charged for rations purchased; (5) additional taxes by reason of salary adjustments; (6) the reasonable cost to the defendant of housing facilities voluntarily accepted and actually lived in by any employee, the term "voluntary" being construed to apply only to such employees as were in defendant's employ on October 25, 1938, and who were at that date living in company houses and who after that date continued to live therein. The reasonable cost per month was stated as follows:

| Type of dwelling | Number of rooms | Monthly rental for entire dwelling |
|---|---|---|
| Houses and housing space in depot | 1 | $2.00 |
|  | 2 | 4.00 |
|  | 3 | 5.00 |
|  | 4 | 6.00 |
|  | 5 | 7.50 |
|  | 6 | 8.00 |
| Single boxcar or one-half of double boxcar | | 2.00 |
| Double boxcar | | 4.00 |

It was provided that where two or more employees occupied one dwelling each employee was required to pay a proportionate part of the rental charged for the entire dwelling. No deduction was to be made for any room unless it had a minimum linear measurement of 8 feet 6 inches in width by 9 feet 6 inches in length, or a minimum area of 80.75 square feet, unless such room was used as a kitchen in which case the minimum was 7 feet 6 inches by 9 feet or 65.7 square feet. No deduction was to be made for any housing facility unless

a privy and water supply were reasonably accessible and in a reasonable state of repair. If the privy or water supply were separated by a railroad main line or actively used switching tracks they were not deemed reasonably accessible. The seventh and final deduction was for wages theretofore paid in cash. The difference between the deductible items and the minimum wage credit, if any, was required to be paid to each employee.

In 1940 the claims in the bill that petitioner was making a profit from the sale of rations and was not keeping proper records were dropped by the administrator.

Petitioner first began on June 16, 1939, and after the filing of the bill of complaint, to charge its employees on its books with the alleged cost of facilities furnished them and to credit the employees with 25 cents per hour instead of 20 cents per hour. It concluded that if the administrator did not accept their view to the effect that the 5-cent difference between the 20 cents and 25 cents was made up by facilities furnished free, it would credit the 25 cents and charge for the facilities.

In 1940, after signing the stipulation and in order to conform to the stipulation, petitioner organized a force of traveling auditors who were given detailed instructions. It then devised a form of report to be prepared for each employee which was submitted to and approved by the administrator's representative. The face of the form contained columns necessary to supply all data with respect to the period worked, the actual rate of pay, the hours worked, the compensation due at the minimum wage, the rental chargeable, the rent charged, the other deductions specifically authorized, and the net amount due the employee or owing by him. On the reverse side there was a list of questions and instructions for the purpose of determining whether the employees or the housing facility came within the above noted provisions of the stipulation. Thereafter these traveling auditors went over the entire railroad system of petitioner, visited the quarters and made reports with respect to each employee and the quarters furnished, after which the individual reports were completed. It was necessary to make approximately 8,500 such reports because some of the employees had left the service and others had changed their place of employment. No entries were made on the face of the form with respect to wages due after June 16, because on that date petitioner had adopted the practice of crediting to each employee on its books the full minimum wage. The form shows no charge was made originally by petitioner for facilities prior to June 16, 1939, but does show charges for facilities beginning June 16, 1939. The reports do not contain any record subsequent to May 1940, because thereafter, and prior to the closing of its books for 1940, petitioner adjusted its records for the balance of the calendar year 1940 to conform to the stipulation.

The work relating to the collection of data and computations was completed by November 1940 and thereafter was checked by representatives of the Wage and Hour Administrator. It was then determined under the stipulation that there were due certain amounts to certain of the employees, which amounts were paid in 1940 and entered as an expense on petitioner's books and claimed as a deduction in computing its Federal income tax for 1940 as follows:

| | |
|---|---|
| For 1938 | $44, 302. 42 |
| For 1939 | 177, 107. 43 |
| Total for 1938 and 1939 | 221, 409. 85 |
| For 1940 (to June 1) | 38, 974. 00 |
| Total | 260, 383. 85 |

Respondent disallowed as a deduction for 1940 the $221,409.85, representing wages paid for services rendered in 1938 and 1939.

OPINION.

In 1938 and 1939, when petitioner paid its maintenance of way employees it took the position that nothing more was due them. Although the Wage and Hour Administrator contended that additional payments were called for, this claim was rejected in its entirety by petitioner, and that position was maintained until in the tax year before us the dispute was adjusted and the litigation brought to test petitioner's liability was settled. Thus the circumstances went further than establishing a liability, the amount of which had merely not then been determined. Petitioner's position was to deny all liability for the whole amount in controversy, with the result that it would not have been permitted, even had it attempted to do so, to accrue any part of the disputed payments in the years covered by the claim. Settlement of the dispute transformed the obligation for the first time into one which was sufficiently definite to be the subject of an accrual.

In *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516, the Supreme Court said:

\* \* \* It has never been questioned that a taxpayer who accounts on the accrual basis may, and should, deduct from gross income a liability which really accrues in the taxable year. It has long been held that, in order truly to reflect the income of a given year, all of the events must occur in that year which fix the amount and the fact of the taxpayer's liability for items of indebtedness deducted though not paid; and this cannot be the case where the liability is contingent and is contested by the taxpayer. Here the taxpayer was strenuously contesting liability in the courts and at the same time, deducting the amount of the tax, on the theory that the state's exaction constituted a fixed and certain liability. This it could not do. It must, in the circumstances, await the event of the state court litigation and might claim a deduction only for the taxable year in which its liability for the tax was finally adjudicated.

In *Security Flour Mills Co.* v. *Commissioner*, 321 U. S. 281, it was reiterated that:

It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting. * * * Since it denied liability for, and failed to pay, the tax during the taxable year 1935, it was not in a position in its tax accounting to treat the Government's claim as an accrued liability.

In *Jamaica Water Supply Co.* v. *Commissioner* (C. C. A., 2d Cir.), 125 Fed. 512, a question similar to this one arose in reverse. There the Commissioner charged the taxpayer with income in the year in which its disputed claim for certain rentals was finally adjusted. Notwithstanding that the rentals were for periods prior to the year in question, the taxpayer's contention that they were subject to accrual at that time and not in the tax year was rejected on the ground that settlement of the dispute was necessary to remove the contingency and justify accrual. The opinion observes:

* * * So the dispute between the City and the petitioner, while it did relate solely to the rate, was not one which when finally determined would inevitably result in some amount being due from the City to the petitioner. It would only have that result in the event that the payments made by the City should turn out to be less than what was just and reasonable. Consequently, one stumbling block in the way of accruing the amount of the petitioner's claim in the years 1923 to 1928, inclusive, was that the petitioner's right to receive any part of the increased charges it made was itself disputed. It had no uncontested right to be liquidated merely but only a wholly disputed claim.

That being so, it was too uncertain during the years mentioned that the petitioner would ever receive anything at all on its claim to make any accrual then possible. * * *

It is true that the claims involved in the Supreme Court cases cited consisted of a disputed liability for taxes, and that the *Jamaica Water Supply* case was concerned with an item of accrued income as opposed to a deduction. But "If the liability of the obligor is too contingent to be accrued as a loss to him, it would seem to follow that the claim of the obligee is likewise too contingent to be considered compensation for a loss already realized by the latter." *Commissioner* v. *Thatcher & Son* (C. C. A., 2d Cir.), 76 Fed. (2d) 900, 902.

And in *Ederer Net & Twine Co.* v. *United States*, 7 Fed. Supp. 282, the Court of Claims said (p. 286):

Plaintiff kept its books under the accrual system and if the additional compensation finally allowed Corkran became a fixed liability in 1918 within the meaning of the law, it was entitled to a deduction accordingly. But we are clear that it did not * * * The dispute as to whether Cockran was entitled to the sum he claimed was not settled until sometime in 1920 and he was not given credit for the disputed item until December 31, 1921. We are not called upon to determine whether plaintiff was liable under the contract with Corkran * * *.

We think the rules above laid down show that the Commissioner's refusal to allow the deduction for and in the year 1918 was correct.

We have no doubt that the principles involved are of general application, that this petitioner could not have succeeded in any attempt to take advantage of the deduction in a prior year, and that for present purposes there is no effective distinction between a creditor's obligation to accrue income and the debtor's privilege of accounting for the corresponding deduction. It follows that the accrual was proper and respondent's determination in this respect erroneous.

### 2. Accrual of Capital Stock Tax.

#### FINDING OF FACT.

Petitioner and each of its subsidiaries, including the Atlanta, Birmingham & Coast Railroad Co., the Rockingham Railroad Co., and the Virginia & Carolina Southern Railroad Co., made a declaration of value of their capital stock in returns filed for the year ended June 30, 1938. They elected to file returns for the year ended June 30, 1939, and 1940, upon adjusted declared value. Returns filed for the year ended June 30, 1941, were based on a newly declared value. The taxes shown on the returns, which were duly paid, were as follows:

|  | Atlantic Coast Line | Atlanta, Birmingham & Coast | Rockingham | Virginia & Carolina |
|---|---|---|---|---|
| Year ended June 30, 1939 | $27,878.00 | $1,331.00 | None | $160.00 |
| 1940 | 33,509.30 | 1,349.70 | None | 159.50 |
| 1941 | 125,000.00 | 6,250.00 | $50.00 | 250.00 |

Petitioner and its subsidiaries kept their books and filed their returns upon an accrual and calendar year basis. It was the consistent practice of petitioner and its subsidiaries to accrue capital stock taxes over the 12-month period to which the tax related. The accruals during the last six months of the calendar year were based upon the declaration made in July. The accruals during the first six months of the following calendar year varied, as petitioner then took into consideration any change in the rate of the tax, the effect of earnings during the past calendar year, and the trend of earnings during the current year. This was done in order to make a return of value which would avoid the imposition of declared value excess profits taxes under section 600 of the Internal Revenue Code.

In accordance with this consistent practice, in July 1938 petitioner and each of its subsidiaries estimated their capital stock taxes for the year ended June 30, 1939, at the $1 rate then in effect and one-half thereof was entered as an accrual prorated monthly over the last six months of the calendar year 1938. During the first six months of the calendar year 1939 these monthly accruals were continued, but adjust-

ing entries were made at least by June of amounts which resulted in the accrual during this six-month period of the balance of the exact amount of capital stock tax shown on the return which was filed in the following July or later. This same method was employed with respect to the last half of 1939 and the first half of 1940, except that the 10 cents increase in rate levied by the Revenue Act of 1940 was accrued in the first six months of 1940. With respect to the tax for the year ended June 30, 1941, all of the adjusting entries were not actually made until after the enactment of the Revenue Act of 1941, approved September 20, 1941, because during the early summer it was thought that the capital stock tax would be repealed by the new revenue act.

During the last six months of the calendar year 1938 petitioner entered as accruals $16,063.89 representing one-half of its estimated capital stock tax for the year ended June 30, 1939, and during the first six months of the calendar year 1939 petitioner entered as accruals $11,814.11 representing the balance of its capital stock tax of $27,878, as shown by its return filed in July 1939. During the last six months of the calendar year 1939 petitioner entered as accruals $14,500 representing one-half of its estimated capital stock tax for the year ended June 30, 1940, and during the first six months of the calendar year 1940 petitioner entered as accruals $19,009.30 representing the balance of its capital stock tax of $33,509.30 as shown by the return filed July 31, 1940. During the last six months of the calendar year 1940 petitioner entered as accruals $18,000 representing one-half of its capital stock tax for the year ended·June 30, 1941, and during the first six months of the calendar year 1941 petitioner entered as accruals $28,000. This increase in accruals was made because petitioner was beginning to show very high earnings. As it was thought in the summer that the capital stock tax might be repealed, no further accruals were made until the passage of the Revenue Act of 1941, at which time the rate of tax was increased from $1.10 to $1.25 per $1,000. During this period, when the earnings of petitioner greatly increased, it was thought desirable for petitioner to increase its declared value in order to avoid a declared value excess profits tax, and in the latter half of the calendar year 1941 an additional $79,000 was accrued, based upon an anticipated declared value of $100,000,000, the tax on which was $125,000. This was the valuation declared in petitioner's capital stock tax return for the year ended June 30, 1941, which was filed October 27, 1941. Despite this greatly increased valuation petitioner paid a declared value excess profits tax of $32,000 on its earnings for the calendar year 1941 under section 600 of the Internal Revenue Code. During the last six months of the calendar year 1941 petitioner entered as accruals $62,500 representing one-half of its estimated capital stock tax for the year ended June 30, 1942. The total accruals for the last six months of the calendar year 1941 were $141,500.

The only accrual made by Rockingham Railroad Co. was $150 entered as an accrual for 1941, representing the entire capital stock tax for the year.ended June 30, 1941, as shown by the return filed.

During the last six months of the calendar year 1938 Virginia & Carolina Southern Railroad Co. entered as accruals $88 representing one-half of its estimated capital stock tax for the year ended June 30, 1939, and during the first six months of the calendar year 1940, it entered as accruals $72 representing the balance of its capital stock tax for the year of $160, as shown by the return filed. Its capital stock tax for the year ended June 30, 1940, was $159.50, but it is not shown in what year the tax was entered as an accrual on its books. Its capital stock tax for the year ended June 30, 1941, was $250, but it is not shown in what year the tax was entered as an accrual. The company entered as accruals for capital stock tax in the calendar year 1940 the sum of $144.75.

The totals of the amounts entered as capital stock tax accruals during each of the calendar years 1939, 1940, and 1941, were as follows:

|  | 1939 | 1940 | 1941 |
|---|---|---|---|
| Atlantic Coast Line R. R. Co. | $26,314.11 | $37,009.30 | $169,500.90 |
| Atlanta, Birmingham & Coast R. R. Co. | 1,246.50 | 1,359.05 | 5,575.15 |
| Rockingham Railroad Co. | None | None | 150.00 |
| Virginia, Carolina & Southern R. R. Co. |  | 144.75 |  |

The amounts accrued in 1939 and 1940 were claimed as deductions in the consolidated returns filed for said years.

In the audit of petitioner's income tax returns for prior years beginning with 1936 respondent ruled that the entire capital stock tax for the year ended June 30 is accruable and deductible in computing Federal income taxes in July of the preceding calendar year. Until the present proceeding petitioner did not contest the action of respondent because it had no material effect upon its income taxes. In accordance with this practice respondent here determined that the entire capital stock tax for the year ended June 30, 1941, was allowable as a deduction in computing the Federal income taxes of petitioner and its subsidiaries for the calendar year 1940.

The following is a tabulation showing deductions for capital stock tax respectively claimed and allowed for 1940.

|  | A. C. L. | A. B. & C. | Rockingham | Va. & Car. S. |
|---|---|---|---|---|
| Capital stock tax returned for year ended June 30, 1941, at $1.25 rate | $125,000.00 | $6,250.00 | $150 | $250.00 |
| Amounts deducted on taxpayer's books and claimed in return filed for calendar year 1940 | 37,009.30 | 1,359.05 | None | 144.75 |
| Difference allowed as a further deduction by respondent | 87,990.70 | 4,890.95 | 150 | 105.25 |
| Additional deduction representing 10¢ increase in rate of tax for year ended June 30, 1940 | 2,973.30 | 121.80 | None | None |
| Total additional deduction allowed | 90,964.00 | 5,012.75 | 150 | 105.25 |

The method of accounting employed by petitioner and its subsidiaries had the approval of the Interstate Commerce Commission and was the basis of petitioner's financial reports to the public and to the Commission. Under the facts it was impossible to determine what value to declare for a particular capital stock tax year until the time the return was filed because of the permission granted to taxpayers to change the declared value and because of any change in the rate of tax.

OPINION.

The second issue involves the proper disposition of petitioner's accrued liability for Federal capital stock tax. On July 1 of each year, when it made its capital stock tax return for the preceding twelve months, petitioner systematically set up an accrual for the succeeding six months of a like proportionate amount as being the nearest estimate it could make of the prospective capital stock tax liability. During the first six months of the following calendar year, monthly accruals of an amount looking to an adjustment to the new estimate due the coming July 1 were entered. Respondent has disapproved this method, contending that the entire tax was accruable in advance Neither party contends that the amount of the tax, dependent as it is upon a future declaration of value and possible change in rate, is so uncertain at the beginning of the capital stock tax year that its accrual should be postponed to the end, and this would be inconsistent with what we held in *Budd International Corporation*, 45 B. T. A. 737; reversed other grounds (C. C. A., 3d Cir.), 143 Fed. (2d) 784.

The dominant characteristic of this situation is that petitioner has consistently followed the method of accounting it now seeks to have approved. Unlike such cases as *Budd International Corporation*, *supra*, where the taxpayer's inconsistent treatment was emphasized, our sole present concern is whether this petitioner's regularly employed system of keeping its records was such as to reflect its income properly. If so, no compelling reason for condemning it has been advanced. Sec. 43, I. R. C.

Two recent cases seem to us to suggest an affirmative answer. In both, the question was slightly different, involving the proper disposition of accrued local property taxes during a short year of less than 12 months. But in both an allocation on a monthly basis of one-twelfth of the total tax was approved, notwithstanding that the tax accrued annually and that the liability for it arose as a whole and was not divisible. *Commissioner* v. *Shock, Gusmer & Co.* (C. C. A., 3d Cir.), 137 Fed. (2d) 750; *Allen* v. *Atlanta Stove Works* (C. C. A., 5th Cir.), 138 Fed. (2d) 452.

The analogy to the recurring impact of the capital stock tax is striking. To one on the calendar year basis, the tax, accruing as it

does on each July 1 for the ensuing year, inevitably covers six months in one income tax period and six months in the next. In a sense, therefore, each year presents the comparable problem of a short period and the consequent possibility of monthly accruals.

That petitioner resorted to this device of month by month deduction for allocating to each year's business the appropriate proportion of this tax strikes us under the circumstances as eminently reasonable and as in no degree a distortion of its true net income. And that the regulatory bodies having jurisdiction over petitioner's normal business and financial operations viewed this procedure as proper is not only confirmatory of our conclusion, but in a sense an added reason for it.

True, there was a technical liability on July 1 of each year for the entire tax. True, an estimate could be, and was in fact, made in advance as to its amount. But the inaccuracy of the two variables, valuation and rate, from which the result was reached made petitioner reluctant, as it does us, to extend the necessary error any further than need be. To quote from *Allen* v. *Atlanta Stove Works, Supra:*

* * * It is true that as between the state or city and the taxpayer the charge is not apportionable. The tax is payable in a lump sum for the support of government, and is not abated by the sale or destruction during the year of the property in respect of which he is taxed, and as between the taxing authority and the taxpayer it is not apportionable. But the United States is seeking, by the provisions of Section 43 to get a fair picture of the net income of its taxpayer for the period covered by the return. * * *

And in *Commissioner* v. *Schock, Gusmer & Co., supra,* it seemed to the court "that both of the New Jersey taxes under consideration would in the normal course be treated as part of such overhead expense, not for the year *in* which they were assessed but for the year *for* which they were assessed. And if a taxpayer kept his books on a monthly accrual basis as the taxpayer did here, he would normally and naturally accrue his state property taxes in twelve equal monthly instalments."

It is recognized that an increase in the rate of the capital stock tax creates a charge accruable only in the year the change becomes cognizable. *First National Bank in St. Louis,* 1 T. C. 370. We think it consistent with this and with the principles already noticed that petitioner should have maintained its accounts as it did. We regard this portion of the computation as erroneously established by respondent.

### 3. Loss and Bad Debt Deduction.

#### FINDINGS OF FACT.

Petitioner and Louisville & Nashville Railroad Co. (hereinafter called L. & N.) are joint lessees of the railroad properties of the Georgia Railroad & Banking Co. in the State of Georgia. These

properties are separately operated by Georgia Railroad, an unincorporated agency, for and on account of the lessees. They are operated as a separate entity and Georgia Railroad makes separate reports to the Interstate Commerce Commission. Petitioner and L. & N. also own stock control of the Atlanta & West Point Railroad Co. (hereinafter called Atlanta), which operates a line between Atlanta and West Point, Georgia. The president of Atlanta is also general manager of Georgia Railroad, and the comptroller of Atlanta is also comptroller of Georgia Railroad, and president of Georgia Highway Transport Co. (hereinafter called the Transport Co.).

Transport Co. was organized in 1928 for the purpose of establishing a coordinated service by highway in conjunction with transportation by rail of the Georgia Railroad. It established a bus line 10 miles in length on a branch line of Georgia Railroad between Social Circle and Monroe, Georgia. This connected an important town with a junction of Virginia Railroad.

The authorized capital of Transport Co. was $60,000, of which $40,000 par value was subscribed and paid for by Georgia Railroad and $20,000 par value was subscribed and paid for by Atlanta, as follows:

| Year | Stockholder | Amount |
|------|-------------|--------|
| | | *Par value* |
| 1928 | Georgia Railroad | $15,000 |
| 1930 | Georgia Railroad | 5,000 |
| 1930 | Atlanta | 20,000 |
| 1931 | Georgia Railroad | 20,000 |
| Total | | 60,000 |

In 1929 Atlanta desired to discontinue the operation of a round trip passenger train, the travel on which had diminished practically to commuter travel. It applied to the Georgia Public Service Commission for authority to discontinue, but the application was denied. It reapplied and proposed to extend the bus service of Transport Co. to take care of the commuter service. This application was granted, conditioned upon the continuance of the bus service. At about this time Atlanta purchased the $20,000 of Transport stock and Georgia Railroad the remaining $25,000.

In 1930 Georgia Railroad applied to the Georgia Public Service Commission for authority to discontinue the operation of two round trip trains, one operating between Atlanta and Social Circle, a distance of 51 miles, and the other operating between Augusta and Thompson, a distance of 37 miles, because the travel had been reduced practically to commuter travel. This application was denied, and on a reapplication proposing that bus service would be supplied the application was granted, conditioned upon the maintenance of the bus service.

In 1932 Georgia Railroad applied to the Georgia Public Service Commission for authority to establish a bus route between Thompson and Social Circle, which would then provide a bus connection between the terminus of each established bus route. This additional service could have been operated with the existing equipment and the through rates applicable would offset the losses resulting from commuter travel for which the company could charge only one cent a mile. This application was denied by the Commission upon the ground that its policy was to maintain competitive transportation between highway and rails.

Thereafter in 1932 Transport sold another bus route, that between Atlanta and West Point, to Hood Motor Co., and in 1934 it sold the two bus routes between Atlanta and Social Circle and Augusta and Thompson to Transco Co. Transport continued to operate the bus route originally established between Social Circle and Monroe. After the sale of the Atlanta and West Point route Atlanta sold its stock in Transport to Georgia Railroad for $2,800, which was its then book value. Atlanta had advanced Transport moneys which had been repaid prior to the sale of its stock to Georgia Railroad.

After the denial of its application to provide coordinated bus service, Transport and Georgia Railroad continued to entertain the hope that the Georgia Public Service Commission might change its policy and permit such service.

In 1939 a representative of the Interstate Commerce Commission suggested to Georgia Railroad that its investment in Transport was carried at an inflated figure. The officers of Georgia Railroad, after a study of the matter in 1940, reached a conclusion that Public Service Commission would not change its policy and decided to place the Transport Co. in bankruptcy. Transport sustained annual operating deficits from the beginning of its operation as follows:

| | | | |
|---|---|---|---|
| Aug. 18 to Dec. 31, 1928____ | $80. 85 | 1936____ | $44. 74 |
| 1929____ | 1, 441. 24 | 1937____ | 370. 74 |
| 1930____ | 11, 379. 81 | 1938____ (profit) | 44. 85 |
| 1931____ | 17, 665. 60 | 1939____ | 439. 70 |
| 1932____ | 20, 634. 87 | Jan. 1 to Aug. 31 1940____ | 442. 71 |
| 1933____ | 11, 827. 83 | | |
| 1934____ | 6, 101. 91 | | 71, 088. 93 |
| 1935____ | 703. 82 | | |

During this period Georgia Railroad has made advances to Transport for purchase of equipment and expenses of operation. The last advance was made in September 1937 in the amount of $500, and the last payment on account of advances was made in September 1936, in the amount of $500. Net advances as of January 1, 1940 were $13,000.

On March 21, 1940, Transport Co. gave its note to Georgia Railroad in the amount of $3,000, secured by its remaining assets, reducing the

open account to $10,000. The collateral comprised one 12-passenger Dodge bus, shop equipment, and franchise. The book value of the bus was $1,853.38 and depreciation thereon $829.96, and the book value of the shop equipment was $89.87. The note was curtailed to $2,230.62 in August 1940. In September 1940 Transport Co. filed a voluntary petition in bankruptcy in the United States District Court for the Northern District of Georgia, which on September 23, 1940, ordered that "until further order of the Court, no Trustee be appointed." The grounds for failing to appoint a trustee was that there were no assets to administer and no equity to be preserved for creditors. Georgia Railroad was "authorized and allowed to foreclose its bill of sale." Application of the proceeds of the sale reduced the note to $1,597.61. The balance of the open account of $10,000 was reduced to $9,870.77 by a credit of miscellaneous assets.

Comparative general balance sheets of the Transport Co. as of April 30, 1930, April 30, 1931, December 31, 1938, December 31, 1939, and August 31, 1940, disclose the following:

| | 4/30/30 | 4/30/31 | 12/31/38 | 12/31/39 | 8/31/4 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Investments | $35,557.19 | $55,701.89 | $1,937.75 | $1,943.25 | $1,943.25 |
| Current assets | 9,806.30 | 3,425.17 | 1,141.06 | 1,062.30 | 44.76 |
| Unadjusted debits | 2,063.37 | 2,124.70 | 277.32 | 303.23 | 392.36 |
| Total | 47,426.86 | 61,251.76 | 3,356.13 | 3,308.78 | 2,380.37 |
| **LIABILITIES** | | | | | |
| Stock | 40,000.00 | 60,000.00 | 60,000.00 | 60,000.00 | 60,000.00 |
| Current liabilities | 7,159.47 | 5,763.11 | 13,104.85 | 13,150.04 | 12,415.34 |
| Unadjusted credits | 4,895.37 | 13,738.07 | 457.80 | 804.96 | 1,053.96 |
| Total liabilities | 52,054.84 | 79,501.18 | 73,562.65 | 73,955.00 | 73,469.30 |
| Profit and loss balance | *4,627.98 | *18,249.42 | *70,206.52 | *70,646.22 | *71,088.93 |
| Total | 47,426.86 | 61,251.76 | 3,356.13 | 3,308.78 | 2,380.37 |

*Red figures.

Thereafter Transport filed a petition in the Superior Court of the County of Richmond, Virginia, for permission to amend its charter permitting the issuance of new class A common stock of the par value of $100 each and for an order declaring the outstanding common stock of $60,000 par value "null and void." This petition was granted by order dated November 23, 1940, and on or about November 29, 1940, the Georgia Public Service Commission approved the issuance of the new class A common stock which was purchased at par by Georgia Railroad. Since that time Transport Co. has continued in business in the operation of the Social Circle–Monroe route, which was first inaugurated by it.

In making its income tax return for 1940 to be incorporated in the income tax returns of petitioner and L. & N., a loss was determined in connection with the Transport Co. as follows:

| | |
|---|---:|
| Cost of Transport Co. stock | $42,800.00 |
| Advances | 13,000.00 |
| Total | 55,800.00 |
| Payments received | 1,531.62 |
| Loss | 54,268.38 |
| One-half to petitioner | 27,134.19 |

Respondent disallowed the entire deduction upon the ground that it had become worthless prior to 1940.

The stock became worthless prior to 1940.

The indebtedness remaining unpaid became totally uncollectible in 1940.

OPINION.

Petitioner contends that the voluntary bankruptcy of the bus company in 1940 was the identifiable event giving substance to its loss. It asserts that the decision of petitioner's officers to liquidate the investment at that time should be respected as a finding of worthlessness on their part, and hence that application of the so-called "subjective test" requires its recognition. *Rosenthal* v. *Helvering* (C. C. A., 2d Cir.), 124 Fed. (2d) 474.

In this contention petitioner seems to have been misled by a confusion between losses and bad debts. The "subjective test" controversy arises from the use of the word "ascertainment" in the bad debt section. It has never properly been applied to such losses as petitioner's stock investment. "Losses not compensated for by insurance or otherwise are deductible under section 23 (f) only in the year in which they are sustained. No problem of the taxpayer's ascertainment of the time of the loss is involved in such instance. *Eckert* v. *Burnet, supra* [283 U. S. 140], at page 142; *Rosenthal* v. *Helvering* * * *." *Reading Co.* v. *Commissioner* (C. C. A., 3d Cir.), 132 Fed. (2d) 306, 311.

Nor do we think the bankruptcy itself was, on this record, the signal denoting that the stock had become worthless. We need not concern ourselves with the possibility that the continued operation of the bus line was, under the circumstances, inconclusive on the ground that the conduct of a public carrier may be distinguished from ordinary business enterprises. Cf. *William L. Taylor*, 37 B. T. A. 1055. For here, the question that presents itself is not whether the value was then extinguished, but rather, whether it had not been lost long before.

An examination of the bus line's history seems to permit only the conclusion that whatever value, actual or potential, may have been attributable to the business vanished when the principal routes were sold in 1932 and 1934. Thereafter the deficits, while small, were consistent. In only one year was there a profit, and that negligible.

And between 1931 and 1938, as the findings show,[2] assets of $61,000 were reduced to $3,300, while liabilities fell only from $79,000 to $73,000. We are not advised of the details of the sales, but it seems reasonable to regard them, and not the bankruptcy, as the significant events establishing the hopelessness of the operation.

As to the indebtedness, however, the situation is different. This is not due primarily to the matter of "ascertainment," for by section 124, Revenue Act of 1942, the requirement of ascertainment was eliminated, and the amendment was made retroactive to 1939 and subsequent years. The struggle between "subjective" and "objective" may thus have been terminated from that time on. But in this case the indebtedness never became wholly worthless, and a debt worthless only in part need not be deducted at the creditor's peril. *Moock Electric Supply Co.*, 41 B. T. A., 1209. No change in this rule appears to have been intended by the 1942 amendment. See Revenue Act of 1943, sec. 113.

Nor can we seriously doubt that the advances in question constituted a debt, and not merely additional capital investments. Petitioner was, through the unincorporated agency of Georgia Railroad, a coowner of the bus line with the L. & N. Railroad. In such a situation the respective interests of the parties must be preserved by treating their shares in accordance with actual legal consequences. Cf. *Nemerov* v. *Helvering* (C. C. A., 2d Cir.), 139 Fed. (2d) 690. Some repayments had in fact previously been made, which is in itself inconsistent with mere capital investment. And, as we have seen, the final repayment occurred in the year we are considering and demonstrated that this debt, as distinguished from the stock, was not wholly uncollectible. We, accordingly, take the view that the deficiency properly disallowed the loss on the stock, but not the deduction for the unpaid advances.

This deficiency, for the reasons set forth under subdivision 2 of the present opinion, will not be reduced or canceled by any credit offered by respondent on account of the asserted inadequacy of the capital stock tax deductions. Cf. *E. B. Elliott Co.*, 45 B. T. A. 82.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

ARUNDELL, *J.*, dissents.

———

HILL, *J.*, dissenting: My disagreement has to do only with the second question in the case. The correct answer to the second question considered in the majority report depends on the proper application of the accrual system of accounting in respect to the capital stock tax for each of the capital stock tax taxable years ended June 30, 1939, 1940 and 1941. The capital stock tax for each such year is determined

———
[2] Figures given here are approximate.

by applying the statutory rate of tax to the adjusted declared value as of the end of the income tax taxable year next preceding the end of the then current capital stock tax year. The capital stock tax is accruable when the obligation therefor arises and such obligation arises immediately upon the beginning of a capital stock tax taxable year. The obligation thus arising is for the whole of the capital stock tax for the current capital stock year ending June 30 next following. The capital stock tax is due on or before 30 days after the end of the capital stock tax year. Within such 30 day period a return thereof is required to be made in which the taxpayer sets forth the adjusted declared value as a basis for computing the capital stock tax for such capital stock tax year. The amount of the tax which was accruable within the capital stock tax year is thus definitely determined.

To a taxpayer on the accrual system an obligation must be accrued when it becomes accruable. The obligation for the capital stock tax does not arise piecemeal or by installments. There is no warrant, therefore, within the purview of the taxing statutes, to divide the amount of the obligation for accruals at successive, postponed periods. Hence, it is my view that the capital stock tax of petitioner for each of the capital stock tax years involved accrued at the beginning of such tax year to the extent of the amount of the obligation dependent upon the tax rate obtaining at the beginning of each such year. On June 25, 1940 the capital stock tax rate was increased by ten cents. The tax obligation because of such increase in the rate was, therefore, accruable and therefore accrued on such date and not prior thereto.

Since petitioner's income tax taxable year is the calendar year, the deductions for income tax purposes of the capital stock tax must be taken in the income tax taxable year in which the capital stock tax accrued. The income tax years here involved are 1939 and 1940, hence, deductions are allowable for the entire capital stock tax for the taxable years ended June 30, 1940 and 1941.

The obvious result of petitioner's allocation of accruals of the capital stock tax in respect of the income tax years involved was to afford an opportunity to so adjust such allocations as to produce a tax benefit from deductions thereof which would not obtain in the absence of such allocation. If the allocation of the tax obligation for accrual purposes had been of twelve equal parts the opportunity for the tax benefit above indicated would have been minimized but probably not entirely eliminated.

The facts show that for the capital stock tax year ended June 30, 1939, the tax was $27,878, of which $16,063.89 was accrued to the first half and $11,814.11 was accrued to the second half of such year. The capital stock tax for the year ended June 30, 1940 was $33,509.30, of which $14,500 was accrued to the first half and $19,009.30 was accrued to the second half of such year. For the capital stock tax year ended

June 30, 1941, the tax was $125,000, of which $18,000 was accrued to the first half and $107,000 was accrued to the second half of such year. Applicable to the capital stock tax year last mentioned a new declaration of value was made which was greatly in excess of the adjusted declared value of the previous year. Such increased value was declared to minimize a declared value excess profits tax on the greatly increased profits realized by petitioner in the calendar year 1941. It appears, therefore, that in respect to the capital stock tax year ended June 30, 1941 petitioner adjusted the allocation of accruals as between the periods falling in different income tax taxable years to a large extent on a consideration of the relative amounts of its profits in such years and the correlative importance of allocating deductions. It is certainly not clear that the allowance of deductions for income tax purposes in accordance with such allocation was not a distortion of income.

While it is my opinion that there is no legal justification for any allocation of the capital stock tax to separate periods within the capital stock tax years, yet if such allocation is to be permitted it must be allocated evenly throughout any such year.