MERIT TANK AND BODY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Merit Tank & Body, Inc. v. Commissioner
Docket No. 8380-78.
United States Tax Court
T.C. Memo 1980-175; 1980 Tax Ct. Memo LEXIS 410; 40 T.C.M. (CCH) 368; T.C.M. (RIA) 80175; May 19, 1980, Filed David Loyal Jones, for the petitioner. Joyce Elaine Britt, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $10,182 in petitioner's Federal corporation income tax for the year 1974.The only issue for decision is whether petitioner is entitled to a bad debt deduction under section 166[1] in the amount of $26,982.58. FINDINGS OF FACT Some of the facts were stipulated and are found accordingly. The stipulation of facts, together with the accompanying exhibits, is incorporated herein by this reference. [2]
*412 Petitioner is a California corporation, incorporated on August 6, 1957. From the date of its incorporation up to and including all times relevant herein, petitioner had its principal place of business in Alameda County, California. At all times relevant herein, it was engaged in the business of manufacturing and repairing truck tanks for the transport of petroleum products and other liquids.It maintained its records on the basis of the calendar year and filed a Federal corporation income tax return for the year 1974. Except as hereinafter indicated, petitioner's shares were at all relevant times held in equal numbers by Enrico Rosso, Vincent Scapparo, and Dante Martinelli. During the years 1970 through 1974, Rosso was petitioner's president as well as one of its directors. At all relevant times, Rosso, Scapparo and Martinelli were actively involved in the conduct of petitioner's business. Tanger Industries (Tanger), is a California corporation incorporated on August 29, 1967, with its principal place of business at Los Angeles County, California. On April 2, 1973, Tanger officially changed its name of Verit Industries. For the sake of convenience, the name Tanger will *413 be used hereinafter to refer to the corporation both before and after April 2, 1973. Tanger maintained its books on the basis of a fiscal year ending June 30th. On October 29, 1970, petitioner entered into an agreement with Tanger captioned "Plan of Reorganization and Agreement." The agreement provided for petitioner's shareholders to exchange all the outstanding capital stock of petitioner for Tanger stock. Petitioner's stockholders entered into employment contracts with Tanger and continued to conduct petitioner's operations. The plan of reorganization was implemented and petitioner became a wholly owned subsidiary of Tanger. Rosso, Scapparo, and Martinelli gradually became dissatisfied with petitioner's being part of the Tanger group, because they disapproved of various financial practices of Tanger and feared that such practices might ruin petitioner's business which they had developed since the time of its incorporation. Finally, in early January 1973, they informed Tanger that they wished to withdraw from the Tanger group. Tanger agreed to the withdrawal, and on January 15, 1973, Rosso, Scapparo, and Martinelli entered into an agreement with Tanger to transfer to *414 Tanger all of the Tanger common stock (with certain minor adjustments) which had been issued to them in connection with the October 29, 1970, agreement in exchange for all the outstanding stock of petitioner in equal shares. The agreement was drafted by petitioner's attorney. At the time of this agreement, petitioner and its shareholders (Rosso, Scapparo, and Martinelli) also executed a general release discharging Tanger from -- all claims, demands, agreements, contracts, covenants, representations, warranties, promises, undertakings, actions, suits, causes of action, obligations, ontroversies, debts, costs, expenses, accounts, damages, judgments, losses and liabilities, of whatsoever kind or nature, in law, equity or otherwise, whether or not presently known or unknown, and whether or not disclosed or concealed, which against them, or any of them, the undersigned has had, may have had or now has, or which any of their respective successors, or assigns, hereafter can, shall or amy have for or by reason of any matter, cause or thing whatsoever, specifically excluding only rights or claims arising out of the representations, warranties, or obligations of Tanger set forth in the agreement *415 signed that day. The release further provided: It is expressly understood that Section 1542 of the Civil Code of California provides as follows: "1542. General Release; extent A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which, if known by him, must have materially affected his settlement with the debtor." The undersigned, and each of them, hereby specifically and intentionally WAIVE any rights they or any of them may now or hereafter have under said Section 1542 of the Civil Code of California, as well as theprovisions of all comparable, equivalent or similar statutes and principles of common law of California and of the other states of the United States, and they acknowledge and agree that this waiver is an essential and material term of this General Release, without which the said General Resease and other consideration would not have been delivered by Tanger. * * *
Tanger executed a similar general release in favor of petitioner, Rosso, Scapparo, and Martinelli. *416 Petitioner's income for the period of October 29, 1970, through January 15, 1973, was included in the consolidated returns filed by Tanger for the taxable years including that period. Prior to the reorganization, petitioner's records were kept by its accountant, Jim Clark, of Moran and Co., Oakland, California. After the reorganization, petitioner kept some records of its own, but other books were kept by Tanger's accountant and, in particular, petitioner did not do its own tax accounting. Jim Clark was not employed by petitioner during the period it was part of the Tanger group and he was ultimately dismissed by Tanger. From time to time, Tanger would orally request from petitioner amounts to be used for the payment of taxes. Petitioner paid these amounts without reviewing Tanger's books. Petitioner's shareholders did not ask to see the books maintained by Tanger. After the withdrawal agreement, Jim Clark resumed petitioner's accounting and set up new books for petitioner. In the course of this being done, Rosso concluded that petitioner had paid to Tanger approximately $31,000 more than its allocable share of the consolidated taxes of the Tanger group during the period *417 October 29, 1970, through January 15, 1973 (see n. 8, infra). Rosso called LaVerlin, chairman of the board of Tanger, and concluded that LaVerlin thought Tanger owed petitioner money but did not have funds to pay it. Petitioner brought suit against Tanger. David Swanson joined Tanger in June 1973 as corporate comptroller, held that position until September 1973, and was thereafter secretary-treasurer of Tanger until 1976. Throughout that period and up to the time of trial, he was vice-president in charge of finance. In that capacity, he helped prepare Tanger's 1974 annual report. The annual report of Tanger and its subsidiaries for 1974 showed: (a) net losses of $113,573 for the fiscal year ending June 30, 1974, and of $848,632 for the fiscal year ending June 30, 1973; (b) gross sales and other income of $27,142,061 in the 1974 fiscal year and $25,562,554 in the 1973 fiscal year; and (c) a net worth of $1,996,850 at the end of the 1974 fiscal year and $3,084,618 at the end of the 1973 fiscal year. Tanger never filed a petition in bankruptcy or for an arrangement under the Bankruptcy Act. It was a going concern on October 11, 1979, the date of trial herein. Tanger *418 never executed a note for the repayment of the amount petitioner claimed was owed to it nor any other written acknowledgement of any obligation in respect of any such claim.
OPINION The sole issue for decision is whether petitioner is entitled to deduct $26,982.58 as a bad debt under section 166.[3] Petitioner alleges that during the period from October 29, 1970, to January 15, 1973, when it was a subsidiary of Tanger Industries and filed consolidated tax returns with Tanger, Tanger requested and obtained from petitioner funds for the payment of taxes in excess of petitioner's allocable share of the consolidated income tax liability. [4] Petitioner asserts that Tanger thereby became indebted to petitioner for the excess amount, that in 1974 Tanger became unable to repay such debt, and that, to the extent it exceeded an amount received by petitioner under a settlement agreement with Tanger, the debt became worthless. *419 At the outset, we note that, given the purpose of petitioner's claimed payment (see n. 4, supra), the legal implications of the issue before us have been the subject of a recent decision of this Court. Globe Products Corp. v. Commissioner, 72 T.C. 609 (1979). In that case, we held that the deduction of any portion of the consolidated income tax collected from any member of the affiliated group is precluded by section 275, which provides that no deduction is allowable for Federal income taxes. The foundation of our decision was that, because the consolidated income tax regulations provided that all members of an affiliated group are severally liable for the entire tax on the consolidated income, [5] each member of the group was liable for that tax and that any obligations of the members of the group inter sese were irrelevant. Furthermore, we specifically held that section 166 cannot be used to circumvent the clear prohibition of section 275 against the deduction of Federal income taxes. See 72 T.C. at 619. *420 Petitioner points out various factual differences which, it contends, distinguish Globe Products Corp. v. Commissioner, supra, from the instant case. [6] Having carefully reviewed our prior decision in Globe in light of petitioner's arguments, we find no distinctions which would render the reasoning in that case inapplicable herein. We therefore conclude that, even if we were to accept petitioner's factual position as having been established (which we do not), our decision in Globe would be controlling. Cf. Arrigoni v. Commissioner, 73 T.C.     (Feb. 6, 1980). Despite this conclusion, in the interest of completeness, we think it appropriate to deal with further questions presented by the parties. *421 Section 166 allows a deduction for any debt which becomes worthless within the taxable year. Petitioner has the burden of proving the existence of a bona fide debt and that such debt became worthless during the taxable year in question. Millsap v. Commissioner, 46 T.C. 751, 762 (1966), affd. 387 F.2d 420 (8th Cir. 1968); sections 1.166-1(c) and 1.166-2(a), Income Tax Regs.; Rule 142(a), Tax Court Rules of Practice and Procedure.
The parties argue at length as to whether the general release signed by petitioner on January 15, 1973, upon withdrawal from the Tanger group, extinguished any claim that it might otherwise have had against Tanger. Their disagreement relates to the application of the parol evidence rule in light of Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), revg. and remanding 44 T.C. 549 (1965), upon which respondent relies, and petitioner's contention that the release was induced by fraud on the part of Tanger and was, therefore, invalid. We find it unnecessary to resolve this disagreement and the consequent impact of Danielson, because we are satisfied that, on the record before us, *422 petitioner has failed to sustain its burden of proof [7] that it should not be held to the terms of that release which operated to discharge prospective, as well as existing, claims (see p. 5, supra); consequently, it had no claim of indebtedness against Tanger during the taxable year 1974. [8] Again in the interest of completeness, we turn to an analysis of the other evidence presented at the trial. *423 As further basis for its claim against Tanger, petitioner offered the testimony of two witnesses -- Rosso, who was petitioner's president and one of its shareholders prior and subsequent to the reorganization, and Swanson, who joined Tanger and became its vice-president of finance after the period during which petitioner was a member of the Tanger group.Rosso testified that he believed petitioner had a claim against Tanger because he had been so informed by petitioner's accountant. The accountant did not testify and no reason was given for his failure to do so. As an offer of proof of the truth of the accountant's assertion as to the existence of a claim, such testimony is hearsay and is not admissible evidence. Fed. R. Evid. 801(a), (b), and (c) and 802; see also Fed. R. Evid. 602 and 701. Swanson also offered an opinion, based on work sheets he had prepared as extracts or analyses of two documents (petitioner's tax return for a fiscal period ended November 7, 1970, and a financial statement prepared by an auditor for the consolidated group), that petitioner had a valid claim against Tanger. Swanson did not participate in the preparation of those documents and was not employed *424 by Tanger at the time they were prepared. Petitioner did not produce those documents at trial nor did it make them available to respondent for inspection prior to trial, although petitioner did not claim that such documents were unavailable. The individuals who prepared those documents did not testify. Upon respondent's motion, Swanson's work sheets were excluded from evidence. The hard fact, with respect to Swanson's testimony and his work sheets (and indeed the testimony of the accountant even if he had been produced as a witness) is that we would not have been required to accept such testimony (as we are not required to accept Rosso's testimony) because the underlying documentary material -- to wit, the books and records of the Tanger group -- was not produced; nor does the record contain any evidence as to why they were not produced other than some generalized statements of difficulties in obtaining such books and records and the alleged unavailabiltiy of other witnesses. There is not the slightest indication in the record that petitioner made any attempt to subpoena such books and records or witnesses. Even if the books and records were so voluminous that they might not *425 have conveniently been introduced into evidence, they should at least have been available for inspection by the Court and respondent in order to determine the extent to which they might have been properly offered into evidence or, at the very least, utilized by respondent to conduct a meaningful cross-examination. Fed. R. Evid. 1002 and 1004; United States v. Kim, 595 F.2d 755, 764 (D.C. Cir. 1979); Peter Kiewit Sons' Co. v. Summit Construction Co., 422 F.2d 242, 266-267 (8th Cir. 1969); Pritchard v. Liggett & Myers Tobacco Co., 295 F.2d 292, 301 (3d Cir. 1961). [9]
In light of the foregoing, and keeping in mind that *426 the party having the burden of proof must bear the consequences of the unavailability of evidence necessary to establish his claim ( Burnet v. Houston, 283 U.S. 223, 228 (1931), cf. Malinowski v. Commissioner, 71 T.C. 1120, 1124-1125 (1979)), we hold that the above-mentioned testimony of Russo and Swanson is totally insufficient to enable petitioner to carry the day. The only other evidence offered by petitioner to prove the existence of an indebtedness was the testimony of Rosso and Swanson as to the initiation of a lawsuit by petitioner against Tanger arising out of the alleged overpayments of more than $30,000 and to the settlement of that suit by the equal division by the parties of a check for approximately $8,000, received as a tax refund from the Internal Revenue Service, payable to Tanger and petitioner.We find it unnecessary to explore respondent's attempt to apply Fed. R. Evid. 408 to exclude any evidence as to the settlement because we are convinced that, in any event, the claimed settlement of the lawsuit for a relatively small portion of the amount at issue (approximately $4,000) would *427 not establish that petitioner had a valid claim against Tanger. [10] An offer of settlement, particularly a small one, may be motivated merely by a desire to avoid the burdens of protracted legal proceedings, rather than by a recognition of the validity of the opposing party's claim. See McCormick on Evidence, sec. 274 (2d ed. 1972). To draw an inference that Tanger's offer to compromise was an acknowledgement of the validity of petitioner's claim would be particularly inappropriate in this case, where the record suggests that Tanger needed petitioner's endorsement to cash the refund check which was divided in settlement of the law suit. The settlement may well have been viewed by Tanger, not only as a way to avoid litigation, but also as the cost of obtaining petitioner's endorsement. Furthermore, even if petitioner had proved the existence of a claim, the record before us does not support the conclusion that any *428 debt arising therefrom became worthless in 1974. Whether a debt is worthless depends upon an analysis of all the pertinent facts and circumstances. Dustin v. Commissioner, 53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). The only evidence tending to support petitioner's position that the claimed debt became worthless in 1974 was testimony to the effect that Tanger was experiencing financial difficulties and was subject to certain liabilities contingent upon the outcome of pending litigation and its financial statements showing large net losses in 1973 and 1974. Swanson's testimony that in 1974 Tanger "paid the bills when [it] could," without further elaboration as to how often Tanger could pay its bills, provides no sustenance to petitioner. Moreover, Tanger's net loss decreased from $848,632 in its fiscal year ended June 30, 1973, to $113,573 in its fiscal year ended June 30, 1974, indicating, if anything, that Tanger's earning capacity and potential ability to pay improved in 1974. Cf. Pierson v. Commissioner, 27 T.C. 330, 338, 339 (1956), affd. 253 F.2d 928 (3d Cir. 1958). In addition, Tanger had *429 gross receipts of $27,142,061 in its 1974 fiscal year and there is no evidence that any debt owing to petitioner could not have been paid out of gross receipts. [11] Neither Russo's nor Swanson's belief that any claim petitioner may have had against Tanger became worthless in 1974 is sufficient to overcome such objective evidence. Bryan v. Commissioner, 281 F.2d 238, 243 (4th Cir. 1960), affg. on this issue 32 T.C. 104 (1959); Aagaard v. Commissioner, 56 T.C. 191, 209 (1971). Cf. Boehm v. Commissioner, 326 U.S. 287 (1945). Finally, Tanger's balance sheet shows that it had assets in excess of liabilities in its 1973 and 1974 fiscal years of $3,084,618 and $1,996,850, respectively. Tanger never filed a petition in bankruptcy or for an arrangement under the Bankruptcy Act and, at the time of trial, was still a going concern. See Roussel v. Commissioner, 37 T.C. 235, 245-246 (1961). While petitioner is correct that the absence of bankruptcy proceedings (cf. Atlantic Coastline Railroad Co. v. Commissioner, 4 T.C. 140, 155 (1944)) *430 and the survival of the debtor corporation ( Riss v. Commissioner, 478 F.2d 1160, 1166 (8th Cir. 1973), affg. on this issue 56 T.C. 388 (1971)) does not necessitate a finding that a debt was not worthless during the taxable year at issue, it is equally true that the mere fact that the debtor experiences losses does not establish that a debt is uncollectible. [12] See Riss v. Commissioner, 56 T.C. 388, 405-410 (1971), affd. on this issue 478 F.2d 1160 (8th Cir. 1973), and affd. sub nom. Commissioner v. Transport & Equip. Co., 478 F.2d 731 (8th Cir. 1973). In sum, aside from the controlling effect of Globe Products Corp. v. Commissioner, 72 T.C. 609 (1979), the *431 testimony and other evidence contained in the record is totally insufficient to enable us to conclude that petitioner has carried its burden of proof. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the taxable year at issue, unless otherwise indicated.↩
2. Several of petitioner's proposed findings of fact allegedly based on the "entire record" contain information only to be found in certain exhibits and parts of the stipulation stricken from the record at trial upon respondent's motion, to which petitioner agreed. Such information is not part of the record and cannot serve as a basis for our findings of fact.↩
3. In its petition, petitioner sought in the alternative to deduct the amount in question as a loss under section 165. Petitioner states on brief, however, that the only issue is deductibility as a bad debt under section 166, and, therefore, we regard it as having abandoned its position as to deductibility as a loss under section 165. In any event, our reasoning in denying petitioner a bad debt deduction under section 166 would be equally applicable to deny it a loss under section 165. Moreover, by virtue of section 1.1502-6, Income Tax Regs., petitioner was severally liable for the full amount of the consolidated income taxes owed by the Tanger group and would, at best, appear to be entitled to reimbursement as a guarantor in respect of any excess payment -- a position which would require it to prove its right to a deduction under section 166 to the exclusion of section 165. Putnam v. Commissioner,352 U.S. 82↩ (1956). 4. Petitioner has presented no evidence, nor has it argued on brief, that the amounts claimed to have been paid to Tanger were paid for any purpose, or in fact used, other than for the payment of Federal income taxes of the consolidated group.↩
5. The applicable regulation in that case was section 1.1502-15A(a), Income Tax Regs., but the same provision is contained in section 1.1502-6, Income Tax Regs.↩, which applies to the taxable year involved herein.
6. Among the differences noted by petitioner are that the payments in Globe↩ were made subsequent to the issuance of a notice of deficiency, the payments were made directly to the Internal Revenue Service, not to the parent, and other members of the affiliated group were insolvent at the time the group entered into an agreement to share the tax burden.
7. We have thus far refused to accept the limited rule in Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), and have continued to apply the "strong proof" rule. See G C Services Corp. v. Commissioner, 73 T.C. 406, 412 n. 2 (1979); Spector v. Commissioner, 71 T.C. 1017, 1023↩ n. 6 (1979), on appeal (5th Cir. Oct. 3, 1979). 8. Contrary to petitioner, we do not understand respondent to have conceded that, in the absence of the release, petitioner would have had a claim against Tanger. We understand respondent to have conceded only that if petitioner had carried its burden of proving the existence of a claim, respondent would accept petitioner's assertion that the claim was in the amount of $31,378. Respondent stated at trial, "We have never had any proof that they made an overpayment of this amount, although what I'm saying is, that if you do find that there is a claim here, then the $31,000.00 is the amount of it." (Transcript at 26) Moreover, on brief, respondent objects to all evidence of the existence of a claim as hearsay and asserts that petitioner did not establish a basis for its belief that a claim existed.↩
9. We note that, as petitioner's counsel admitted at trial, Tanger's books and records were under Swanson's control. The record does not contain even the minimal foundations which might have established Swanson as an "expert" witness and perhaps brought Fed. R. Evid. 702 and 705 into play. And the absence of the books and records of the Tanger group precludes any consideration of the application of the business records exception to the hearsay rule under Fed. R. Evid. 803(6)↩.
10. Petitioner made no effort to introduce, through the testimony of either Russo or Swanson, the documents and portions of the stipulation of facts relating to the underlying litigation which had previously been stricken from the record. See n. 2, supra↩.
11. See Estate of Besag v. Commissioner, T.C. Memo. 1975-163↩.
12. Petitioner's reliance on Denison v. Commissioner, 4 T.C. 806↩ (1945), is misplaced. That case involved the impact of the expiration of the statute of limitations on the collectibility of a debt, an issue that is not involved herein. See also 5 Mertens, Law of Federal Income Taxation, sec. 30.46 (1980 rev.).