THE CRESSON CONSOLIDATED GOLD MINING & MILLING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 11529. Promulgated August 23, 1948.

*Thomas M. Burgess, Esq.*, for the petitioner.
*George E. Gibson, Esq.*, for the respondent.

### OPINION.

TYSON, *Judge*: The Commissioner determined deficiencies of $5,-771.37 in income tax and $1,425.67 in excess profits tax for the calendar year 1940. The deficiencies are due to the disallowance of $24,047.36 of the amount claimed by the petitioner as a deduction for percentage depletion.

All of the facts have been stipulated and the stipulation of facts and attached exhibits are hereby adopted as our findings of fact.

The petitioner, a corporation of the State of Colorado, with its principal office at Colorado Springs, filed income and excess profits tax returns for the taxable year 1940 with the collector for the district of Colorado.

Since 1894 the petitioner has been engaged in mining and producing gold-bearing ore in the Cripple Creek Mining District, in Teller County, Colorado. For more than 20 years it has owned in fee simple approximately 85 acres of contiguous land in that district, comprising a single tract or parcel; and during 1940 and for many years prior thereto it conducted all mining operations thereon. The petitioner has never produced gold-bearing ores from any other land, nor has it ever owned or held, as lessee, any leasehold interest.

In the conduct of mining activities in 1940 the petitioner operated one shaft, one hoist, one plant, one ore house, one waste-rock dump, one blacksmith shop, one set of power lines, and one aerial tramline to the railroad siding. The petitioner owned all of such property and the entire mining operations were under the supervision of the petitioner's mine superintendent.

During 1940 the petitioner carried on the mining operations under two plans which had been used by it consistently and without material change for a period of more than 15 years. Under one plan (hereinafter sometimes referred to as the petitioner's own operations), the petitioner employed and paid for all labor and paid all operating costs and expenses. Under the other plan (hereinafter sometimes referred to as the contract operations), the petitioner operated through written agreements, known locally as "split-check" leases. These agreements

were entered into with individuals, copartnerships, or corporations, and were not transferable. Approximately 26 of such agreements were in effect during 1940.

The persons with whom these agreements were made (hereinafter referred to as contractors) were granted the right for a definite term (usually one year) to exploit, develop, and mine gold-bearing ore within specified blocks or areas between or including certain levels of the mine adjacent to the shaft of the petitioner. The contractors' mining operations could be reached through and conducted only by the use of the shaft and hoist of the petitioner. They were carried on in the upper levels of the mine, often immediately above mining operations conducted solely by the petitioner. In accordance with an understanding with the contractors, the petitioner furnished supplies, including powder, fuse, compressed air, timber, and drill steel, and it bore all of the expenses of operating and maintaining the shaft, hoist, ore house, surface labor, blacksmith shop, power lines, power costs, and the aerial tramline in connection with the mining operations in the areas covered by the agreements. All waste and nonmineral-bearing rock were hoisted and dumped at the sole expense of petitioner. The mining operations under the contracts were conducted under the management of petitioner's superintendent. The contractors furnished the manpower or labor and some hand tools and machine drills for the conduct of the actual mining operations within the areas covered by the agreements. If the loading of the ore into the tramcars was done at the request of the contractors by employees of the petitioner, the contractors were required to pay the petitioner 10 cents per ton for such services. The minerals produced under the agreements were shipped to a gold reduction mill, which made direct payments to the petitioner and to the several contractors, according to the terms of the agreements. In all of the agreements it was agreed that petitioner should receive 50 per cent of the net mill returns, plus 1 per cent of the gross value of ores for general state property taxes, and that the contractor should receive 50 per cent of the net mill returns. The net mill return, as contemplated in the agreements, is the value per dry ton, less the 1 per cent above referred to, freight, treatment, and sampling charges.

The gross income from ores mined and sold under the contract operations during 1940 was $491,035.53. The petitioner received $234,518.08 and the contractors received $256,517.45 of that amount. The petitioner's net income from such operations was $118,450.14. The gross income of the petitioner from ores mined and sold during 1940 under its own operations was $214,712.91, and its net income therefrom was $1,887.28. The petitioner's combined gross income

from its own and the contract operations was $449,230.99, and its combined net income therefrom was $120,337.42.

In its return for 1940 the petitioner reported $214,712.91 as gross receipts from ore sales and $234,518.08 as royalty income. In computing its net income in its return for 1940 the petitioner claimed percentage depletion in the amount of $60,168.71, which amount is 50 per cent of the combined net income of $120,337.42 and is less than 15 per cent of the combined gross income. The respondent treated the petitioner's own operations as one "property" and its contract operations as one other "property," and disallowed $24,047.36 of the deduction claimed by the petitioner. The respondent's computation is as follows:

|  | Own operations | Contract operations | Combined operations |
|---|---|---|---|
| Gross income from the property | $214,712.91 | $234,518.08 | $449,230.99 |
| Net income from the property | 1,887.28 | 118,450.14 | 120,337.42 |
| Depletion: | | | |
| 15% of gross income | 32,206.94 | 35,177.71 | 67,384.65 |
| 50% of net income | 943.64 | 59,225.07 | 60,168.71 |
| Allowable | 943.64 | 35,177.71 | 36,121.35 |
| Deducted in return | | | 60,168.71 |
| Disallowed | | | 24,047.36 |

In its return for 1934 the petitioner claimed, and the respondent allowed, depletion computed on the percentage basis; and, as part of its return for that year, the petitioner made a written election to have the depletion allowance computed with regard to percentage depletion. For each of the years 1934 to 1940, both inclusive, the petitioner claimed, and the respondent allowed, depletion computed on the percentage basis.

In computing percentage depletion for the years 1934 to 1939, both inclusive, the petitioner and the respondent treated all income from the mining operations as income from one "property," by combining the income from the petitioner's own operations and the income from the contract operations in computing the "gross income from the property" and the "net income from the property." In its return for the taxable year 1940 the petitioner computed percentage depletion in the same manner as in the years 1934 to 1939.

The same mineral lands were operated and the same methods of mining were conducted thereon by the petitioner in each of the years 1934 to 1940, both inclusive.

Section 114 (b) of the Internal Revenue Code authorizes an allowance for depletion, in the case of oil and gas wells, coal mines, and metal mines, measured by a percentage of the income from the property. The provision applicable to coal and metal mines is contained

in section 114 (b) (4), which is set forth in the margin.[1] It provides that the allowance for depletion, in the case of metal mines, shall be "15 per centum, * * * of the gross income from the property during the taxable year," and that "Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property."

The respondent does not dispute the petitioner's right to compute depletion by the percentage of income method, nor does he question the accuracy of the figures reported on the petitioner's return. The only question presented for determination is whether the respondent was right in treating the property used in the petitioner's own operations and the property used in the contract operations as separate properties and computing percentage depletion separately on the income derived from each of such properties, or whether such properties should be treated as a single property and the depletion allowance should be computed upon the combined income from the petitioner's own and the contract operations.

The words "the property," in section 114 (b) (4), are defined in the regulations of the Commissioner. Subdivision (i) of section 19.23 (m)–1 of Regulations 103 provides:

(i) "The property," as used in section 114 (b) * * * (4) * * * means the interest owned by the taxpayer in any mineral property. The taxpayer's interest in each separate mineral property is a separate "property"; but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single "property," provided such treatment is consistently followed.

Subdivisions (b) and (c) of the same section provide:

(b) A "mineral property" is the mineral deposit, the development and plant necessary for its extraction, and so much of the surface of the land only as is necessary for purposes of mineral extraction. * * *

(c) The term "mineral deposit" refers to minerals in place. * * *

---

[1] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

* * * * * * *

(b) BASIS FOR DEPLETION.—

* * * * * * *

(4) PERCENTAGE DEPLETION FOR COAL AND METAL MINES AND SULPHUR.—The allowance for depletion under section 23 (m) shall be, in the case of coal mines, 5 per centum, in the case of metal mines, 15 per centum, and, in the case of sulphur mines or deposits, 23 per centum, of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property. A taxpayer making his first return under this chapter in respect of a property shall state whether he elects to have the depletion allowance for such property for the taxable year for which the return is made computed with or without regard to percentage depletion, and the depletion allowance in respect of such property for such year shall be computed according to the election thus made. If the taxpayer fails to make such statement in the return, the depletion allowance for such property for such year shall be computed without reference to percentage depletion. The method, determined as above, of computing the depletion allowance shall be applied in the case of the property for all taxable years in which it is in the hands of such taxpayer, or of any other person if the basis of the property (for determining gain) in his hands is, under section 113, determined by reference to the basis in the hands of such taxpayer, either directly or through one or more substituted bases, as defined in that section. * * *

The Commissioner argues that the receipt by the petitioner of two types of income, i. e., income from its own operations and "royalty" income from the contractors, indicates the existence of at least two properties; that the petitioner, in executing the split-check leases, carved out of the mineral deposit a part of the whole and created a new property, separate and distinct from the property used in its own operations, and each of the split-check leases is a separate property; and that, therefore, the royalty income and the income from the petitioner's own operations may not be combined in computing percentage depletion. He cites *Helvering* v. *Jewel Mining Co.*, 126 Fed. (2d) 1011, reversing 43 B. T. A. 1123. The petitioner contends that, while the taxpayer in the *Jewel Mining* case was not permitted to combine royalty income and income from its own mining operations, the facts in that case are different from those in the present case, and that all the conditions which the Circuit Court of Appeals there held to be essential to the treatment of two properties as a single property are met by the petitioner here.

During the taxable year and for many years prior thereto the petitioner's own operations embraced mining in certain areas of the mine owned by it in fee simple. In such operations it bore all expenses necessary for the production and disposition of the ore resulting therefrom. With respect to the other areas of the mine, there were outstanding and in force during the taxable year 26 agreements, locally called "split-check" leases, between petitioner and 26 different parties or contractors. The provisions of those agreements were, in substance, as follows: The contractors were given the right, for a term of one year, to exploit, develop, and mine gold-bearing ore within specifically described areas between and including certain levels of the petitioner's mine adjacent to the one shaft and hoist used and maintained by the petitioner for its own operations and which were also to be used in the contract operations; the petitioner was to furnish vital supplies and to bear all the expenses as enumerated in our findings, including the expense of dumping all waste and nonmineral-bearing rock; the contractors were to furnish the labor and some hand tools and machine drills for the mining of the ore in the contract areas and they were to pay the expenses of loading the ore into tramcars. The petitioner's own operations and the contract operations were to be carried on under the supervision of the petitioner's mine superintendent. The petitioner was to receive approximately 51 per cent; and the contractors were to receive approximately 49 per cent of the net mill returns as the consideration for their furnishing such labor and equipment. The agreements were carried out according to their terms.

The mine was consistently operated by petitioner by these two methods for a period of 15 years, including the taxable year. The only

difference between the contract operations and the petitioner's own operations is that, in the latter, the petitioner paid directly all of the operating costs, while, in the former, the petitioner gave the contractors a portion of the proceeds of production from the contract areas in consideration of their supplying certain labor and a small amount of mining equipment. The extent of petitioner's participation in the contract operations is indicated by the receipt by it of gross income of $234,818.08 and net income of $118,750.14 from such operations. In other words, the petitioner expended $116,067.94 during the taxable year in carrying on the contract operations.

Although the agreements with the contractors are called "split-check" leases, we are of the opinion that the terms of those agreements, and the facts and circumstances here shown as to how the parties operated under them, make it quite clear that the agreements are not leases and that the operations in the contract areas did not amount to the operation of separate properties by the petitioner within the meaning of the statute and the regulations. On the contrary, we think that in carrying on its own operations and the contract operations the petitioner merely resorted to two different and convenient methods of paying the operating expenses. Under the one method, the petitioner extracted the ore and itself paid all the expenses of mining, extracting, and selling; under the other method, it provided for paying part of the cost of extracting ore from specific areas in the upper levels of the mine by giving the contractors a part of the ore returns from such areas in consideration of their supplying the necessary labor and a small amount of equipment, while the petitioner paid all other expenses. In operating the mine in this way we think that, in substance and effect, petitioner operated a single property.

In support of his contention that there were two separate properties and that they may not be considered as a single property under the clause in the regulation saying, "but, where two or more mineral properties are included in a single tract or parcel of land, the taxpayer's interest in such mineral properties may be considered to be a single 'property,' provided such treatment is consistently followed," respondent relies on *Helvering* v. *Jewel Mining Co., supra.* Even assuming as contended by respondent, that there were two separate properties, we think the petitioner is entitled to have them treated as a single property.

In the *Jewel Mining* case the taxpayer owned a leasehold estate in a tract of coal land. It operated a coal mine on part of the acreage and subleased the mineral rights in another part of the acreage. The sublessee operated a separate mine on the acreage covered by the sublease, using its own plant and its own capital. The taxpayer had no control over the mining operations of the sublessee and all that it

retained was the right to receive the royalties reserved in the sublease. In the regulations there involved (Regulations 86, Revenue Act of 1934) "the property" was defined as meaning "the interest owned by the taxpayer, freehold or leasehold, in any mineral property," and in all other respects the regulations were the same as those contained in Regulations 103 and quoted above. The question before the court was whether the taxpayer's interest in the properties was to be treated as a single property. The court stated the test prescribed by the regulations to be as follows: (1) The income from the two properties must be consistently treated by the taxpayer as arising from a single property in computing the depletion allowance; (2) there must be an "interest" "owned by the taxpayer" in both properties; and (3) the two properties must be included in a single tract or parcel of land; and that all three of these conditions must coexist. With respect to the second condition, the interest of the taxpayer, the court said that the taxpayer must own the mineral property either absolutely or as lessee; and that the interest must include the mineral deposit, the plant for its extraction, and the necessary surface of the land. It said that the taxpayer's interest in the mineral property and in the mining operations of the sublessee was neither freehold nor leasehold, since the taxpayer had divested itself of all interest in the acreage included in the sublease and retained only a right to receive royalties, and it did not own the plant or furnish any of the capital and it had no control over the management of the mine, and it therefore held that the unity of interest in the two mineral properties required by the regulations was wanting and the taxpayer could not combine the royalty income and the income from its own mine as income from a single property.

Even if we were to hold that the split-check leases executed by the petitioner resulted in the creation of new and separate properties, this would not help the respondent, for here there is that unity of interest in such separate properties and in the property retained and operated exclusively by the petitioner which is essential under the regulations. The petitioner owned the fee and the plant and other mining facilities, and its ownership included the surface land used in the extraction of ore. Furthermore, petitioner for 15 years consistently has treated the income from the contract operations and the income from its own operations as income from a single property, and the properties operated exclusively by the petitioner and those operated under the split-check leases are included within the 85 acres which, as stipulated by the parties, comprise a single tract or parcel. Thus, the three conditions which must coexist in order to justify the treatment of separate interests in two or more mineral properties as a single property are

here present, and upon the authority of the *Jewel Mining* case we would be required to resolve the issue in favor of the petitioner.

We hold that the petitioner is entitled to combine the income from the contract operations and the income from its own operations in computing percentage depletion for the taxable year 1940.

*Decision will be entered for the petitioner.*