TENNESSEE CONSOLIDATED COAL COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 13967, 20228.   Promulgated October 10, 1950.

*Scott P. Crampton, Esq.,* and *Paul E. Schaub, C. P. A.,* for the petitioner.
*Homer F. Benson, Esq.,* for the respondent.

426

428

OPINION.

DISNEY, *Judge:* (1) The first question for our consideration is whether the petitioner is entitled to accrue month by month its deductions for vacation payments due June 1 of the following year in accordance with the existing contracts between it and the United Mine Workers of America. Respondent contends that petitioner is entitled to deduct. each year, only the amount actually paid.

The petitioner's position is that it basically had an obligation to make vacation payments to its miners and in accordance with the then existing contract it accrued a specific proportion each month in order to have a sufficient amount of money on hand to make the payment when the time of payment arrived, June 1 of the following year. The respondent's position is that the petitioner could not compute the amount of vacation pay until the close of the contract year for the reason that only the employees on the payroll at that time were entitled to vacation pay, and because of the possibility of strikes, and probability of increase in vacation pay. The petitioner's answer to this part of the respondent's argument is that its labor turnover is practically negligible, and, says petitioner, "it seems obvious that under the provisions of the pertinent labor contracts, the petitioner 'incurred' approximately one-twelfth of its liabilities to its miners during each month in which they worked."

The petitioner cites *Lucas* v. *American Code Co.*, 280 U. S. 445, and *Continental Tie & Lumber Co.* v. *United States*, 286 U. S. 290, for the principle that losses which are reasonably certain in fact and ascertainable in amount are deductible, in certain circumstances, before they are absolutely realized. The principle we consider inapplicable to the instant case. The contract, providing for vacation payments, specifically states that certain requirements must be met before the petitioner is required to make payments. As to any particular miner, as we interpret the contract, he (the miner) has not established any right to any part of his vacation pay until he has completely complied with every part of the contract. The circumstances in the *Continental Tie & Lumber Co.* case are different from those of the case at bar, in that there all had been done that could have been done to establish liability; all that remained to be done was to calculate the liability, but in the instant case vital facts remained to be determined, i. e., how many of

the miners, if any, would qualify for vacation payments on the date of the proposed payment, and how much it would be. As we understand the contract, every miner who collects the vacation payments must, individually, measure up to specified standards.

The possible occurrence of a condition subsequent to the creation of a liability is not grounds for denying the accrual of the liability at the time of its creation. *United States* v. *Boston & Providence R. R. Corporation*, 37 Fed. (2d) 670; *The Boston American League Baseball Club*, 3 B. T. A. 149. Liability for payment in the instant case depended on a condition precedent, i. e., whether or not the miners, individually, were working for the company on the date required in the contract and had complied with the requirements contained therein. "The accruability test of a debt is not certainty of payment. but rather certainty of its liability * * *." *Trans-California Oil Co., Ltd.*, 37 B. T. A. 119, 127. The petitioner's liability for the vacation payments here in question did not become certain until the arrival of the date specified in the contracts. Before such a date the petitioner did not have the facts necessary to calculate its liability whereby it could accrue a specified portion of its vacation payments each month. There might be strikes or changes in amount of vacation payments. The petitioner has not shown that there was not possibility or probability thereof. We conclude that the petitioner is not entitled to the additional deductions claimed in its petition for accrued vacation payments.

(2) In regard to the question as to the disallowance of the vice president's salary for the years 1943, 1944, and 1945, the petitioner apparently relies almost completely on the testimony that Lulu R. Hampton performed the same services in 1943, 1944, and 1945 that she had performed in 1942. Coupled with the fact that the respondent allowed a salary of $6,000 for that year, petitioner claims that at least that amount should be allowed for the years 1943. 1944, and 1945. Such a conclusion does not necessarily follow. The Commissioner may have erred in fact in allowing anything for the year 1942; in fact by his amendment he appears to allege in effect error in his previous calculation and asks that the $6,000 also be disallowed. The mere fact that an amount was allowed in an earlier year does not justify a deduction in later years in the absence of evidence to substantiate the deduction.

Lulu R. Hampton attended directors' meetings, for which she received a director's fee. The record before us contains very little evidence in regard to her activities as vice president. There is some evidence that she talked to the secretary and treasurer, but no indication that she did so in the capacity of vice president of the company.

She may have discussed the company affairs as a mere stockholder or as a director. An assumption that the talks involved discussion of company matters by her as vice president would be unwarranted. Nor does any evidence convince us that the infrequent talks were of the value claimed. We conclude that petitioner has not shown that the respondent erred·in disallowing as deductions the entire salary payments made to its vice president (Lulu R. Hampton) for the years 1943, 1944, and 1945.

Petitioner on its income tax return filed for 1942 claimed $13.000 as compensation paid to Lulu R. Hampton as vice president. The respondent in his deficiency notice disallowed $7,000 of this amount as a deduction for salary, thereby allowing the payment of $6,000 of the total. In its petition the petitioner assigns as error the respondent's disallowance of the deduction of $7,000 of the salary paid to its vice president for the year 1942. This issue of the case was waived by petitioner's attorney in his opening statement at the hearing, thereby making it unnecessary for him to present any testimony in regard to the salary question for the year 1942. The respondent, at trial, moved to amend his answer to disallow the deduction of $6,000 salary to Lulu R. Hampton for 1942 previously allowed in the deficiency determination. He was granted permission to file, in writing, an amendment to his answer to conform to proof in that respect, with permission to the petitioner to reply. Such amendment was filed, alleging that Lulu R. Hampton did not render services of any consequence to petitioner in 1942, and that no part of the deduction claimed for salary to her is deductible. The petitioner replied thereto, denying generally, and alleging that petitioner and respondent had agreed that Lulu R. Hampton in 1942 rendered services of a reasonable value of $6,000. and that respondent is estopped to contend otherwise. The agreement relied on is merely a revenue agent's report disallowing only $7,000 of $13.000 deducted as salary for Lulu R. Hampton, and, of course, respondent is not estopped to allege his error. He has, however, the burden affirmatively to show such error. The amount of Lulu R. Hampton's services has been above discussed in connection with the years 1943. 1944. and 1945, where the petitioner had the burden of proof. The evidence is general, with no designation of any portion as applying particularly to 1942. We have concluded above that the petitioner did not meet his burden as to 1943, 1944, and 1945. The same is true as to the respondent as to 1942. On the indefinite evidence, we can not say that in 1942 Lulu R. Hampton is affirmatively shown not to have performed services of a reasonable value of $6,000. Though there is no agreement, and no estoppel, there is failure of proof by the respondent as to 1942 on this point, and deduction of $6,000 is sustained.

(3) (a) Section 23 (m) of the Internal Revenue Code grants, in the case of mines, a deduction of a reasonable allowance for depletion according to the peculiar conditions of each case. Section 114 (b) (4) of the Internal Revenue Code allows percentage depletion for coal and other mines. It provides that the allowance for depletion under section 23 (m), in the case of coal mines, shall be 5 per cent of the gross income from the property during the taxable year, but such allowance shall not exceed 50 per cent of the net income of the taxpayer from the property, computed without allowance for depletion.

In considering this particular question we consider the 3 tracts of land (i. e., the Palmer Tract, the Syndicate Tract, and the Niack Tract) comprising the petitioner's holdings as a single unit. The only problem for our determination is whether the parts of it called the "fringe" areas, which were leased on a royalty basis to other operators, constitute separate properties for determining depletion for income tax purposes. The respondent argues, on the authority of *Helvering* v. *Jewel Mining Co.*, 126 Fed. (2d) 1011, that the leased property may not be included to constitute a single mining property since the petitioner does not have a single economic interest in the 2 properties. The petitioner argues that the *Jewel Mining Co.* case is distinguishable from the instant case, for in that case, says petitioner, "the taxpayer had only a leasehold interest to begin with and when it sublet a part of the tract, it no longer had—as to the leased area—either a freehold or a leasehold interest." In contrast, petitioner claims, in the instant case. that it "has had a freehold interest in the entire tract right along." Furthermore, says petitioner, the "case is also of doubtful authority since it was based on Treasury Regulations 86, Art. 23 (m)–1 (*j*) which interpreted the statutory word 'property' as meaning 'the interest owned by the taxpayer, freehold or leasehold, in any mineral property.' The words 'freehold or leasehold,' however, were stricken from the regulations applicable to the years here involved." The petitioner places its reliance primarily upon *Mascot Oil Co.*, 29 B. T. A. 652, appeal dismissed, 75 Fed. (2d) 1009. In that case the court, in determining the meaning of "property," looked at the matter from the standpoint of the original owner and not the lessee, and held that a bonus paid by a sub-lessee for the exclusive privilege of drilling was income from the property. In *Cresson Consolidated Gold Mining & Milling Co.*, 11 T. C. 192, dismissed, 175 Fed. (2d) 774, it was held that agreements called "split-check" leases made by the owner of a gold mine to others, granting the right to mine specific blocks of ore, did not prevent the whole property from being properly considered as one under section 114 (b) (4) of the Internal Revenue Code. It is true that the "split-check" leases there involved left more control in the grantor than the leases here involved, but the Court

pointed out that "the petitioner owned the fee and the plant and other mining facilities, and its ownership included the surface land used in the extraction of ore"; and that there was "that unity of interest in such separate properties and in the property retained and operated exclusively by the petitioner which is essential under the regulations." Here, also, the fee was owned by the petitioner and the leases on the "fringe" areas were obviously made because the petitioner would never reach them in its ordinary operations, they being about 12 to 14 miles from the tipple. They were, nevertheless, part of petitioner's holdings, which lay almost entirely in one body, and it is not contended that there was any physical separation of these leases from the portion where the petitioner itself carried on mining operations. Under all of these circumstances, it seems to us that there is here the same "unity of interest" as in the *Cresson Consolidated* case, particularly since petitioner continued to own the fee under the "fringe" areas. It had not separated its original ownership by leasing those areas, such as might be contended had it merely assigned or subleased its right under a lease. as in the *Jewel Mining* case. We, therefore, consider and hold that there was a single property covering petitioner's operations and those in the "fringe" areas.

(b) In computing petitioner's net income from mining operations for the purpose of determining depletion under the percentage method, the respondent allocated indirect expense between direct and other expenses on the basis which each of the two bore to petitioner's total expenses. The respondent cites, as his authority for such allocation, section 29.23 (m)−1 (*g*) of Regulations 111. As additional authority, the respondent cites the following cases to support its position : *Rocky Mountain Oil Co.*, 36 B. T. A. 365 ; *Mirable Quicksilver Co.*, 41 B. T. A. 401 ; *Sheridan-Wyoming Coal Co.* v. *Helvering*, 125 Fed. (2d) 42 ; and *Lumaghi Coal Co.* v. *Helvering*, 124 Fed. (2d) 645.

As we read these cases, none of them support the particular method here advanced by the respondent. Neither do we understand the language of the regulations, above mentioned, to support the respondent's method. As we read the regulations, relied on by the respondent, the dominating theme as to how the indirect expenses shall be allocated is that "they shall be fairly allocated."

We have the uncontradicted testimony of petitioner's superintendent in which he expressed his opinion, based upon his experience, that certain indirect expenses should be allocated in a specified manner between mining expense and expenses other than mining. In his testimony, he gave his reasons to support his conclusions. In the absence of testimony to refute the correctness of his conclusions, we see no reason to conclude that some other determination is correct.

We, therefore, hold that 15 per cent of the power purchased, 25 per cent of superintendent's salary, 15 per cent of depletion-mine timbers, 90 per cent of building repairs, 20 per cent of officers' salaries, and 36.6 per cent of state franchise tax should be allocated to expenses other than mining. The witness offers certain testimony as to the allocation of office salaries connected with the mine office, unemployment and O. A. B. (Old Age Benefit) taxes, and stationery and printing expenses between direct and other expenses, which in our opinion is not borne out by the facts of the case. To a great extent he based his conclusions as to the allocation of these expenses to expense other than mining on the fact that a considerable amount of scrip was printed and distributed to miners during certain seasons. As we view the issuing of the scrip to the miners, we conclude that the scrip was issued in the place of miners' wages rather than, as the witness considered, as a part of the commissary expense. It is certain that the scrip was issued as an advance against wages expected to be earned in the future, for had the petitioner not foreseen the possibility of future services from the miners there is no doubt in our mind but that the scrip would not have been issued. Due to this discrepancy in petitioner's testimony, we have concluded that only 25 per cent of the office salaries in connection with the mine office, the amount expended for unemployment and O. A. B. (Old Age Benefit) taxes on these salaries, and 15 per cent of stationery and printing should be allocated to expense other than mining. Under unemployment and O. A. B. taxes, the amounts expended on salaries paid employees of the commissary, as well as those on 25 per cent of the superintendent's salary, should also be allocated to expenses other than mining. There was introduced into the record Exhibits 22, 23, and 24, which were offered for the limited purpose of showing how the petitioner proposed to allocate the different expenses; hence they were not introduced to prove in any wise any of the expenses enumerated therein. Other than the three named exhibits, we have no testimony from the petitioner to substantiate any of the following expenses: Vacation and portal to portal pay, general office clerks, contributions, office expense, insurance, miscellaneous expense, bonuses and legal expenses; hence, as to these, we sustain the respondent's determination as correct. As for the testimony in regard to depreciation—automobiles and plant, the witness was in no wise conclusive. He was asked the following question: "In line 29 there is an adjustment of depreciation of nearly $118, which I believe should be explained. Are you familiar with that?" which he answered as follows: "I think that was one of the automobiles. That amount was allocated to that for looking after and visiting the rental properties." This was all of the evidence on this part of the question. If the petitioner's witness himself was not sure about the allocation in that he

said "I think" we can not sustain petitioner's contentions on such testimony and, therefore, hold that as to this particular expense respondent did not err in his determination of allocating it as he did.

We have found as a fact the amounts of state, county, and other taxes that should be allocated to expense other than mining as being for the year 1942, $2,737.47; 1944, $2,899.68; and 1945, $3,017.49. Petitioner's witness showed conclusively that these amounts should be allocated in this manner.

(4) We now consider the question as to·when the petitioner could deduct capital stock tax. On September 28, 1943, the petitioner filed its capital stock tax return for the period July 1, 1942, to June 30, 1943, declared a valuation of $2,400,000, accrued the liability in its calendar year 1943. paid $3,000 tax, and deducted the amount accrued and paid as taxes from its income for 1943. It did the same, except as to amounts, on July 24, 1944, for the year 1944, and on July 31, 1945, for the year 1945. The respondent disallowed the deduction for the years taken, ascribing it in each case to the previous calendar year. He contends that the accruable date is the beginning of each of the capital stock tax taxable years, to wit, on July 1, 1942, July 1, 1943, and July 1, 1944, and rests his case in effect on *William C. Atwater & Co.*, 10 T. C. 218, and *Veeder-Root, Inc.*, 11 T. C. 602, which followed it, and cases there cited. The petitioner, on the other hand, contends that after the amendment of the law on capital stock tax on October 21, 1942, by section 301 of the Internal Revenue Act of 1942 [2] the capital stock tax for these years did not accrue until the year in which

---

[2] SEC. 301. CAPITAL STOCK TAX.

(a) TECHNICAL AMENDMENT.—Section 1200 (a) and (b) (relating to rate of capital stock tax) are amended by striking out the word "adjusted" wherever occurring therein.

(b) ANNUAL DECLARATION OF VALUE.—Section 1202 (relating to declaration of value) is amended to read as follows:

"SEC. 1202. DECLARED VALUE.

"(a) DECLARATION OF VALUE.—The declared value shall be the value as declared, by the corporation in its return for the year (which declaration of value cannot be amended). The value declared by the corporation in its return shall be as of the close of its last income-tax taxable year ending with or prior to the close of the capital stock tax taxable year * * *."

\* \* \* \* \* \* \*

(d) PRIOR RETURNS EFFECTIVE.—If a return for the year ended June 30, 1942, is filed under Chapter 6 of the Internal Revenue Code, without regard to the amendment thereof as made by this Act, the adjusted declared value reported by the corporation on such return (whether or not correct) shall constitute the declared value for the purposes of such Chapter 6, as amended by this Act, unless a different value is declared on a subsequent return for such year received within the prescribed filing period.

(e) EFFECTIVE DATE.—This section shall be effective only with respect to the year ended June 30, 1942, and succeeding years.

[3] SEC. 137.33. DECLARED VALUE.—In its return for each year, a corporation must declare a definite and unqualified value for its capital stock. * * *

A corporation may exercise unrestricted judgment and discretion in determining the value to be declared for its capital stock on a return for any year. In making such declaration, the corporation is not bound by any previous declaration of value.

The value shall be declared as of the close of the last income-tax taxable year ending with or prior to the close of the capital stock tax taxable year, * * *.

a capital stock tax return was filed in which it declared the value upon which the tax was to be measured, for the *amount* of its capital stock was contingent until the filing of such capital stock tax return, due within the first month after the capital stock tax periods, because petitioner had the choice, at that time, of declaring its capital stock at zero and paying no tax, or declaring any other value it chose, and that therefore it properly accrued and deducted the liability in the year of declaration. We agree with the petitioner.

The pertinent provisions of the Treasury Regulations (Regulations 64, relating to years ending June 30, 1942, and later) are set forth in the margin.[3] The regulations merely emphasize the statutory expression above seen that declared value shall be the value declared by the corporation, by stating in effect that the corporation can declare any value it sees fit, with judgment and discretion unrestricted. The intent of Congress on this point is expressed in the House Committee Report for the 1942 Revenue Act, 1942-2 C. B. 488, as follows: "Under existing law a corporation may declare such value for its capital stock as it sees fit"—going on to state that section 301 (Revenue Act of 1942) allows a new declaration each year, instead of each third year. In other words, until the filing of the return and declaration, after the close of the capital stock tax year, the amount of declared value, therefore amount of capital stock tax, could not be known, therefore was not accruable in the previous calendar year under the above cases cited by respondent as authority.

In *Lehigh Valley Railroad Co.*, 12 T. C. 977, 998 (involving accrual of state taxes, where general liability for tax was not denied, but the amount was disputed), we said:

> \* \* \* Clearly, the rule requires that, in advance of accrual, all the events shall occur which fix *both* the amount of the tax and the liability of the taxpayer to pay it. [Italics by the Court.]

also that "A liability does not accrue so long as it remains contingent." We cited *United States* v. *Anderson*, 269 U. S. 422, and *Dixie Pine Products Co.* v. *Commissioner*, 320 U. S. 516. Both emphasize that accruability of tax requires occurrence of events fixing both liability for tax and the amount thereof. Here the amount was an unknown quantity until filing of the declaration of value.

Though the *Atwater* case involved 1942 and 1943, the opinion states that since it had been held there was no net income for 1943 it was unnecessary to consider this question as to that year, and as to 1942 the decision was based upon decisions as to earlier statutes as to capital stock tax. The amendment of 1942 was not called to the attention of the Court in the *Atwater* case, therefore was not mentioned or considered in the opinion. The present contention was not raised and the case is distinguishable here. It is specifically based upon cita-

tions of *Bowman Hotel Corporation*, 24 B. T. A. 1193; *Continental Baking Corp.* v. *Helvering*, 77 Fed. (2d) 119, affirming 30 B. T. A. 354; *T. H. Symington & Son, Inc.*, 35 B. T. A. 711; and *Louisiana Delta Hardwood Lumber Co.*, 7 T. C. 994.

The *Louisiana Delta* case involved primarily the question whether under *Atlantic Coast Line Railroad Co.*, 4 T. C. 140, capital stock tax liability should be treated on a monthly accrual basis, and since no authority is quoted on the point here involved, we presume it rests on the other three above-noted citations of the *Atwater* case. All three involve the question of accruability of capital stock tax for the year ending June 30, 1926. The statute then applicable was section 700 of the Revenue Act of 1924. We set it forth, so far as pertinent here, in the margin.[4] It provides, in short, that after July 1, 1924, every domestic corporation engaged in business during the preceding year ending June 30 shall annually pay corporation stock tax on "the fair average value of its capital stock for the preceding year ending June 30 * * *" above $5,000; and that in estimating the value of capital stock the surplus and undivided profits shall be included. Thus, it is crystal clear that in the year 1925, in the *Bowman*, *Continental*, and *Symington* cases, all facts necessary for accrual were known, for liability and amount were determined by the fact of doing business and average value of capital stock in the *previous year* ending June 30, 1925. Though in each case the capital stock year involved was July 1, 1925, to June 30, 1926, the returns and the tax for that period were due on July 1, 1925. The *Continental Baking* case recites: "The Continental Baking Corporation filed its capital stock tax return, Form 707, as required by law, in July 1925, * * * which covered the taxable period ended June 30, 1926." The *Bowman* case says that the corporation "paid capital-stock tax July 1, 1925, amounting to $7,143" and again that the $7,143 was "due and payable from petitioner July 1, 1925." The return was required to be on Form 707,[5] was due on or before July 31, and the tax was "due and payable annually *in advance* from July 1 of each year." "The measure of the tax is the average amount of capital employed in the transaction of business * * * during the *preceding* fiscal year" and the tax is "computed on the basis of the average amount of capital so em-

---

[4] Sec. 700. (a) On and after July 1, 1924, in lieu of the tax imposed by section 1000 of the Revenue Act of 1921—

(1) Every domestic corporation shall pay annually a special excise tax with respect to carrying on or doing business, equivalent to $1 for each $1,000 of so much of the fair average value of its capital stock for the preceding year ending June 30 as is in excess of $5,000. In estimating the value of capital stock the surplus and undivided profits shall be included :

        *           *           *           *           *           *           *

(b) The taxes imposed by this section shall not apply in any year to any corporation which was not engaged in business * * * during the preceding year ending June 30 * * *.

[5] Petitioner's capital stock tax returns, in this case, were on Form 707.

ployed during the *preceding* year ending June 30." (Emphasis added.) Regs. 64, Articles 2, 17, 20, 26, 27.[6] Of course, a tax payable in July 1925, in advance, based on the previous year's experience was accruable in 1925. Obviously the cases were properly decided, but they have no applicability after the amendment of October 21, 1942, when instead of being based upon average value of stock in a previous year, the declared value, therefore the accrual, must rest upon an unrestricted discretion, exercised following the close of the capital stock tax year. It is noteworthy also that the *Bowman* case is based solely, in this respect, upon *Aluminum Castings Co.* v. *Routzahn*, 282 U. S. 92, which was a munitions tax case where the only question was, as specifically pointed out by the District Court, 24 Fed. (2d) 230, merely one of fact whether the corporation was upon a cash or accrual basis, also, that the *Continental* case involved only the question of exemption and that the Board clearly recognized the effect of the 1924 Revenue Act, as above stated, when it said: "At June 30, 1925, all the facts existed and were known upon which the liability to the tax was to be predicated   *   *   *." We notice also that the *Symington* case involved the question of right to accrual by a corporation by which the tax was not paid. The Board said: "The respondent contests the right of Magothy [the corporation, on the accrual basis, which filed the return] to the deduction on the ground that the tax was paid by another." It was also suggested that the assessment resulted from disallowance of Magothy's claim for exemption.

This general question is treated in *First National Bank in St. Louis*, 1 T. C. 370. We there held that additional capital stock tax imposed by an act approved June 25, 1940, and applicable to the capital stock tax year beginning July 1, 1939, was not deductible by an accrual basis taxpayer for the calendar year 1939 because it did not accrue prior to the date of the enactment, citing among other cases the *Anderson* case, *supra*. We pointed out that "Since no event occurred in 1939 which fixed the amount of the petitioner's liability for capital

---

[6] The Capital Stock Tax Act of 1924 was repealed in 1926, and in 1933 a new and different act (National Industrial Recovery Act, Sec. 215) was passed providing, in effect, for a new declaration of value of capital stock each three years, and, in the intervening two years, for the use of such declared value with capital adjustments. However. such capital adjustments were to be made. as stated in section 1202 (b) (1) (E) (iii) of the Internal Revenue Code, from the date as of which the value was declared in the declaration year "to the close of the last income tax taxable year ending with or prior to the close of the year for which the tax was imposed by this section." In short, in anything but a declaration year, the adjustments used in declaring value were only those up to the middle of the capital stock tax year. For example, the declared value for the capital stock tax year July 1, 1937–June 30, 1938, would include (in addition to the value set in the declaration for the previous year) adjustments only to December 31, 1937. Thus, it is plain that in 1937 all the facts necessary for accrual of the tax for July 1, 1937–June 30, 1938, were known; but it is equally plain that after the striking of the word "adjusted" and the institution of a new system, based upon a new and unrestricted declaration each year. by the amendment of October 21, 1942, the situation is altogether different, even from that set up by the Act of 1933.

stock tax at an amount in excess of that allowed by the respondent, no greater amount accrued in 1939 * * *." The case was cited to the same effect in *Houston Natural Gas Corporation*, 9 T. C. 570, where accrual and deduction of additional capital stock tax was allowed in 1940 because imposed by the Act of June 25, 1940. The *First National Bank* case is also cited with approval in *Van Norman Co.* v. *Welch*, 141 Fed. (2d) 99, holding that where a law approved in 1936 increased state taxes for 1935, the increased amount was deductible in 1936. The rationale of these cases is that all events had not earlier occurred to fix the amount and determine the liability for tax. The same is true in the instant case.

The precise question here involved has since been examined in *Cedar Rapids Engineering Co.* v. *United States*, 86 Fed. Supp. 577. The capital stock tax year was the one from July 1, 1941, to June 30, 1942. As here, capital stock tax was paid and accrued in 1942 under a declaration permitted by the amendment of October 21, 1942, and deduction of the amount was taken by the accrual basis taxpayer in its calendar year 1942. The court noted that prior to the amendment of October 21, 1942, capital stock value was declared at 3 year intervals, and the declaration was used, in the two intervening years "taking into account certain adjustments made in accordance with Section 1202"; but that the amendment of October 21, 1942, provided that a taxpayer could file a new declaration of value for 1941–1942, that taxpayer did so, paid additional capital stock tax and deducted it in computing income for the calendar year 1942. As he did here, the Commissioner contended that the amount accrued in the previous year. The court after considering the 1942 amendment and the discretionary declaration held that the taxpayer's liability for the additional capital stock tax arising because of the declaration, in its taxable year, was not fixed and certain in the previous year; therefore that the taxpayer properly deducted the amount in 1942. It is plain that the 1942 amendment presents a new situation on the matter, and that in a year prior to the discretionary declaration thereunder the amount of the capital stock tax could not be fixed or accrued.

In addition we refer to G. C. M. 24461, 1945 C. B. 111. There, in view of the decision in *Atlantic Coast Line Railroad* v. *Commissioner*, *supra*, (allowing accrual of capital stock tax according to a consistent method of periodic accrual notwithstanding accrual of statutory liability on July 1 for the ensuing 12 months) a former G. C. M. 23251 (in effect stating that capital stock tax accrues on July 1 at the beginning of the capital stock tax year) was reconsidered and the opinion was expressed "that a taxpayer should be permitted to follow its method of keeping its books of account in taking the deduction for Federal capital stock tax, provided that such method clearly

reflects the taxpayer's income and is consistently followed for Federal income tax purposes." G. C. M. 23251 was, therefore, modified. The petitioner here appears to have been consistent throughout the taxable years here involved, since the amendment of 1942, in accruing its capital stock tax in the calendar year in which the declaration was made and the respondent does not contend that there was not such consistency.

We conclude that for the taxable years here in question the capital stock tax deducted did not accrue until in the income taxable years in which the petitioner filed its capital stock tax returns, that is, 1943, 1944, and 1945, and that deduction of the capital stock tax so accrued was proper in those respective years.

Revised by the Court.

*Decisions will be entered under Rule 50.*

---

BLACK, *J.*, dissenting: I dissent from the majority opinion on the first point covered in the second headnote. This point is stated in the majority opinion as follows:

* * * (1) Is the petitioner entitled to additional deductions in the amounts of $10,854 and $4,409.26, representing accrued vacation payments claimed by petitioner in its 1943 and 1945 returns, respectively? * * *

I think petitioner is entitled to such additional deductions under the facts as they are found by the majority. These facts need not be repeated here as they are covered by the findings of fact designated "Facts Relating to Vacation Pay Issue." The majority opinion holds that the petitioner is not entitled to such additional deductions.

Petitioner used an accrual system of accounting and it goes without saying that it is entitled to file its income tax returns on that basis. It seems to me that what the Commissioner has done with reference to these vacation pay accruals is to place petitioner on a cash basis as to them and I fail to see the justification for it. In my judgment, to do so is contrary in principle to what we held in *Atlantic Coast Line Railroad Co.*, 4 T. C. 140. The system of accruals by the taxpayer there as to the item in dispute was very similar to the one here used by petitioner. In that case petitioner consistently accrued monthly throughout the last half of one taxable year and the first half of the next year to reflect *estimated* liability for Federal capital stock tax. On these facts we held that such accruals were permissible and not an improper distortion of petitioner's income, notwithstanding that the statutory liability accrues each year on July 1 for a fiscal year covering the ensuing 12 months at the end of which a return is made and tax computed and paid.

In the instant case as a result of the Government's action in directing vacation payments of $50 to petitioner's employees, the petitioner, in

June 1943. paid its miners $25,040 and thereafter began to accrue on its books $2,000 a month in order to meet the vacation payments which, under the directive, it was required to make in 1944. On April 11, 1945, the vacation pay provisions were again amended to provide for vacation payments to the miners at the rate of $75 instead of $50 and petitioner again increased its monthly accruals accordingly. It is difficult for me to see why the doctrine of the *Atlantic Coast Line Railroad Co.* case, *supra*, is not applicable to these facts. In the *Atlantic Coast Line* case, in sustaining the taxpayer in its method of accruing its capital stock tax liability, we said, among other things:

> The dominant characteristic of this situation is that petitioner has consistently followed the method of accounting it now seeks to have approved. Unlike such cases as *Budd International Corporation, supra*, where the taxpayer's inconsistent treatment was emphasized, our sole present concern is whether this petitioner's regularly employed system of keeping its records was such as to reflect its income properly. If so, no compelling reason for condemning it has been advanced. Sec. 43, I. R. C.

It seems to me that it can just as appropriately be said here as was said in the *Atlantic Coast Line* case that "our sole present concern is whether this petitioner's regularly employed system of keeping its records was such as to report its income properly. If so, no compelling reason for condemning it has been advanced." It seems to me that the method which petitioner consistently used in accruing its liability for vacation pay did not distort income, but, on the contrary, aided in clearly reflecting it. Therefore, I see no reason why it should be disapproved.

Under the facts and following *Atlantic Coast Line Railroad Co.*, *supra*, I would sustain petitioner's assignment of error that the Commissioner erred in disallowing $10,854 and $4,409.26, representing accrued vacation payments claimed by petitioner in its 1943 and 1945 returns, respectively.

VAN FOSSAN, *J.*, agrees with this dissent.