Drilling and Service, Inc. v. Commissioner.Drilling & Service, Inc. v. CommissionerDocket No. 51673.United States Tax CourtT.C. Memo 1956-272; 1956 Tax Ct. Memo LEXIS 20; 15 T.C.M. (CCH) 1417; T.C.M. (RIA) 56272; December 11, 1956*20 1. Respondent determined that certain parts of compensation payments to two officer-stockholders were unreasonable in amount and, to the extent which he determined them to be unreasonable, disallowed them as deductions under section 23(a)(1)(A), Internal Revenue Code of 1939. Held, the entire payments made to these two officers as compensation were reasonable in amount and deductible. 2. Respondent disallowed as a deduction under section 23(a)(1)(A) of the 1939 Code, certain automobile rental expense incurred under a contract with a partnership composed of petitioner's stockholders on the ground that the expense was unreasonable in amount and represented a distribution of profits. Held, the amount of rentals that represented an ordinary and necessary business expense determined and the excess disallowed as a deduction under section 23(a)(1)(A) of the 1939 Code. 3. Held, that the fair market value of a block of stock of a closely held corporation that petitioner received in partial settlement of a bad debt was $4 per share rather than $5 per share as determined by the respondent. William P. Fonville, Esq., for the petitioner. Paul M. Newton, Esq., for the respondent. *21 BLACK Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income and excess profits taxes of the petitioner, as follows: TaxableYear EndedTaxDeficiencyFeb. 28, 1951Income and ExcessProfits$18,613.82Feb. 29, 1952Income and ExcessProfits64,543.32The deficiencies are due to the respondent's determination (1) that certain parts of the compensation paid by the petitioner in the fiscal years 1951 and 1952 to its president and secretary-treasurer were unreasonable in amount and therefore not deductible under section 23(a)(1)(A), Internal Revenue Code of 1939; (2) that certain rental expenses incurred under a contract for rental of automobiles with a partnership composed of the petitioner's stockholders were unreasonable in amount and were in distribution of profits and therefore not deductible under section 23(a)(1)(A); and (3) that the fair market value of 19,356 shares of stock of Oil Base, Inc., a closely held corporation, which petitioner received in partial settlement of a bad debt was $5 per share rather than $4 per share as reported by the petitioner. The petitioner objects to all*22 of the respondent's determinations and all of the deficiencies are in issue. Findings of Fact A stipulation of facts has been filed and is incorporated herein by reference. The petitioner is a Texas corporation with its principal office located in Dallas, Texas. The income and excess profits tax returns for the fiscal years ended February 28, 1951 and February 29, 1952 were filed with the collector of internal revenue for the second district of Texas at Dallas. Issue 1 The petitioner was incorporated in Texas on March 1, 1948, and during the period involved here was engaged in the business of selling, leasing and servicing of core barrels and diamond bits and in oil production. It was so engaged both prior to March 1, 1950 and subsequent to February 29, 1952. The petitioner was successor to the business of a partnership which operated under the name of Drilling and Service, Ltd., and engaged in the same business as petitioner. The first partnership of that name began on January 1, 1945 and the business continued in partnership operation to February 28, 1948, when the partnership was dissolved. At the date of dissolution the partners and their percentage of ownership in*23 the partnership were as follows: PercentageNameof OwnershipCarroll L. Deely51J. M. Quinn24T. E. Davis10J. F. Griffin5Patrick Adamson10 These partners became stockholders in petitioner, which succeeded to the business of the partnership, each owning the same percentage of stock in petitioner as he had owned interest in the partnership. The original corporate officers were Carroll L. Deely (hereinafter referred to as Deely), president; J. M. Quinn, vice president; and Eleanor Johnson (hereafter referred to as Eleanor), who then owned no stock in petitioner, secretary-treasurer. These persons continued in office throughout the years in question. On June 10, 1950, J. F. Griffin sold his stock, constituting 5 per cent of the stock of the corporation, to Eleanor. T. E. Davis died on July 23, 1951, and Maude Davis, his widow, succeeded to his 10 per cent of the stock of the corporation. There were no further changes in stock ownership. From the date of its incorporation until February 28, 1950, the petitioner's board of directors was composed of Deely, J. M. Quinn, and Patrick Adamson, who lived in Detroit, Michigan. From and after that date, and*24 including the taxable years here in controversy, the petitioner's board of directors was composed of Deely, Patrick Adamson, and Eleanor. During the first 4 taxable years (the latter 2 years with regard to Deely and Eleanor being in controversy here) the petitioner paid the following compensation to its officers: Fiscal Year Ended2-28-492-28-502-28-512-29-52Carroll L. DeelySalary$18,000$21,000$36,000$36,000Bonus15,00030,00060,00060,000Total$33,000$51,000$96,000$96,000J. M. QuinnSalary$10,000$10,000$10,000$12,000Bonus10,00010,00020,00020,000Total$20,000$20,000$30,000$32,000Eleanor JohnsonSalary$ 3,000$ 4,800$ 7,800$ 8,750Bonus0012,00012,000Total$ 3,000$ 4,800$19,800$20,750The respondent disallowed as deductions, on the ground that they were unreasonable in amount, the following amounts of compensation paid to the petitioner's officers: 19511952Carroll L. Deely$36,000$31,000Eleanor Johnson12,00011,750The increases in the basic salary of Deely and Eleanor are recorded in the minutes of the petitioner's board*25 of directors. The bonuses were approved informally by the board of directors and the total compensation was agreed upon informally by the other stockholders who were not directors. The bonuses were paid in December of each year. The petitioner also had a bonus plan, based upon the quality of the services performed, in which all employees participated. The petitioner was furnished with interim financial statements approximately every month. The following schedule reflects the income and expenses of the petitioner, but does not reflect the adjustments in controversy here: Fiscal Year Ended2-28-492-28-502-28-512-29-52Gross Receipts: Diamond bit sales$1,497,761$1,045,776$1,345,706$2,691,548Core barrels and parts sales362,927373,374394,590754,611Core barrel rentals40,32573,634115,495405,162Core barrel servicing17,20532,81347,917172,598Gross receipts$1,918,218$1,525,597$1,903,708$4,023,919Less cost of sales1,400,5051,212,6491,152,6432,715,546Gross profit$ 517,713$ 312,948$ 751,065$1,308,373Other income3,1191,4889,3146,605Gross income$ 520,832$ 314,436$ 760,379$1,314,978Expenses other than officers' salaries125,824265,750370,935786,000Net income prior to officers' salaries$ 395,008$ 48,686$ 389,444$ 528,978Officers' salaries paid56,00075,800145,800148,750Net income after payment of officers'salaries$ 339,008$ (27,114)$ 243,644$ 380,228*26 The following schedule reflects the condensed balance sheets of the petitioner, but does not reflect the adjustments in controversy here: 3-1-482-28-492-28-502-28-512-29-52Assets$258,914$637,139$528,957$849,548$1,393,396Liabilities$247,373$415,011$363,796$557,172$ 957,841Capital Stock10,00010,00010,00010,00010,000Surplus1,541212,128155,161282,376425,555Liabilities & Capital$258,914$637,139$528,957$849,548$1,393,396The only dividend paid by the petitioner during the 4-year period from March 1, 1948 to February 29, 1952, was a $40,000 cash dividend declared and paid in the fiscal year ended February 28, 1950. Since the inception of the petitioner, Deely, who was about 42 years old during the years in controversy, has continuously been its president and its moving force. After 1 year of college and about 15 years experience in the oil business where he worked for different companies in different capacities, he decided to go out on his own. During those years he developed certain processes and designed certain equipment. He also patented a couple of his inventions and was receiving*27 a royalty of 5 per cent of gross sales on one of them. In 1945, Deely invented and designed a diamond bit and core barrel which in operation proved to be a practical and successful adaption of the art of diamond bit coring, which had been widely used in the mining industry, to the field of drilling for oil. The core barrel was essential to the use of the diamond bit. Deely subsequently obtained letters patent on the core barrel invention and, thereafter, on improvements thereto. Petitioner manufactured, sold, and serviced equipment covered by the two patents on core barrels issued to Deely, as well as the diamond bit and other equipment designed by him. Petitioner paid no royalty as such to Deely for the use of such patents, it being understood that his salary was to include any claim for royalties. Several other companies which were petitioner's principal competitors manufactured similar equipment to that covered by Deely's patents and they also paid him no royalty therefor, nor did he ever demand any such payments from them. The usual royalty for the use of such patents is 5 per cent of gross sales. During the taxable years here involved, the duties of Deely as president of petitioner*28 were primarily to continue the development of the diamond equipment sold and serviced by petitioner. This involved also the developing of particular equipment for each different area or field and the training of personnel in its use. In performing these duties, Deely traveled extensively throughout the United States and foreign countries and was away from the home office in Dallas, Texas, some 75 to 80 per cent of the time. He devoted 7 days a week to the service of petitioner, which included around-the-clock attendance while he was on the job in the oil fields. From the inception of the petitioner, Eleanor, who was about 29 years old during the years in question, has continuously been its secretary-treasurer. Her formal education consists of high school and about seven courses in various business colleges. She had held various office possitions where she earned salaries ranging from $12.50 per week to $350 per month. In the fiscal years involved here it was a part of the duties of Eleanor to act as general manager with responsibility for the operation of the company in the absence of its president, Deely, from the office during the performance of his duties in the field. She was*29 responsible for the entire accounting department of petitioner and had, and exercised, authority to hire and fire personnel in that department. She had authority to sign checks for petitioner without limitation as to amount. She had, and exercised, authority to make deals for petitioner with its customers, including setting of prices. She had, and exercised, authority to make deals for petitioner with its suppliers and handled all purchasing. She worked 10 hours per day in petitioner's office, 7 days per week, and was subject to call 24 hours per day and received numerous calls out of office hours. She was familiar with the operation of petitioner's equipment and was able to, and did, answer inquiries of customers as to the use of the equipment and recommended their needs and designed their programs exercising a choice in a range of 150 different sizes of equipment. She kept track of equipment on the jobs and when it became necessary to move equipment from one job to another she took care of such movement. She had, and exercised, authority to hire and fire men in the field. In the performance of her duties Eleanor contributed materially to the successful operation of petitioner in*30 the fiscal years involved here. The services performed by both Carroll L. Deely and Eleanor Johnson were indispensable to the petitioner and during the years involved it would have been difficult to replace them. The compensation (salaries and bonuses) paid by the petitioner to Deely and Eleanor during the years involved herein was reasonable. Issue 2 As of May 1, 1951, the stockholders of petitioner formed a partnership known as D & S Company (hereinafter sometimes referred to as D & S) to engage in the rental of motor equipment to petitioner and other business activities, including drilling of oil wells. The percentage of interest owned by each stockholder in the stock of the petitioner and by each partner in the partnership D & S was as follows: Percentage of InterestCorpo-Part-rationnershipCarroll L. Deely5150J. M. Quinn2420T. E. Davis1010Patrick Adamson1010Eleanor Johnson510100100Upon the death of the partner, T. E. Davis, on July 23, 1951, his widow, Maude Davis, succeeded to his interest in the partnership, as well as to ownership of his stock in petitioner, and was admitted to the partnership*31 with a 10 per cent interest therein. Petitioner, which had been owning and operating its own automobiles used in its business, determined to begin replacing its own automobiles with leased automobiles in order to free the capital invested in motor vehicles for other uses. The partners in D & S contributed $25,000 in cash to the capital of the partnership. The partnership used the cash to purchase the automobiles which it leased to petitioner. In addition to leasing automobiles to petitioner, D & S subsequently and independently of petitioner engaged in oil field operations and drilling of oil wells. D & S set up books of account. These books of account were kept by the partner Eleanor at her home and not on the premises of petitioner. D & S leased to petitioner Ford customline tudor automobiles equipped with radio, heater, overdrive, seatcovers, and heavy duty overload springs at a rental of $75 per month per car, plus 3 cents per mile, plus $25 per month on new cars held in storage for delivery during the term of the lease. Under the terms of the lease contract petitioner was to pay any repairs and insurance, taxes, title and license fees. Deely made inquiries regarding*32 the rate that a commercial automobile leasing firm would charge under the circumstances and testified that the aforementioned contract rate was based on that information. The cars leased by petitioner were operated off the highways and on ungraded roads hauling heavy equipment in the back, up to five or six hundred pounds, in an extremely rough type of usage. In its fiscal year ended February 29, 1952, petitioner paid and/or incurred as automobile rentals and operating expenses the amount of $127,442.61, and claimed that amount as a deduction on its income tax return for that year. The amount of $75,166.92 included therein represented allowable automobile operating expenses which are not in controversy in this proceeding. The remaining amount of $52,275.69 which was included in the total of $127,442.61 on petitioner's books and records represented the billings from D & S covering the rental charges under the agreement. d & s/ realized a profit of approximately $29,849.08 on the aforesaid sum of $52,275.69. The respondent determined that automobile rental and operating expenses claimed by petitioner in its income tax return for the fiscal year ended February 29, 1952, in the amount*33 of $127,442.61 were overstated by $31,000 representing respondent's estimate of the approximate profit realized by D & S on the rentals received or receivable by it from petitioner for the fiscal year ended February 29, 1952. During 1951, a commercial automobile rental concern in Dallas, Texas, leased approximately 60 Ford automobiles to one of petitioner's competitors for $95 a month, with no additional mileage charge, and the lessee furnished everything. It also, in this period, rented approximately 275 Ford automobiles to an oil company for $90 a month, with no additional mileage charge, with the lessee furnishing everything. On the lease to the former company, the lessor lost several thousand dollars per year and on the lease to the latter company it lost $20,000 per year. In 1952, the same firm leased approximately 16 Ford automobiles, similar to the ones involved here, to another oil company for approximately $125 a month, with no additional mileage charge, with the lessee furnishing everything and on that contract which existed about 9 months, it made a profit. During the years 1951 and 1952, another commercial automobile rental concern in Dallas leased cars to four companies*34 for use in oil fields, leasing approximately 30 cars to each company. The cars so leased were Ford mainline tudors equipped generally with radio and heater and occasionally with overdrive or automatic transmission. Under these leases, although they varied inminor respects, the lessor furnished the automobile and a $100-deductible collision policy and the lessee furnished everything else. The approximate rates under those leases were as follows: Monthly RatePer CarPer Mile RateM & M Drilling Co.$87,50-$90.002"-2 1/2" for mileage over 1800 mi/mo.Workover, Inc.87.50-90.002"-2 1/2" for mileage over 1800 mi/mo.Baker-Taylor Drilling Co.90.003" for mileage over 2000 or 2500/mo.Tubeco90.002"-2 1/2" for mileage over 2000/mo.The same firm also submitted a bid to Hughes Tool Co. on a proposed contract involving 900 automobiles somewhat similar to the ones involved here to be used under somewhat similar circumstances. The quoted rate per car was $130 per month and 3 cents a mile for mileage over 2,000 a month. The bid was rejected for unknown reasons. The sum of $40,000 was a reasonable amount for petitioner to pay D & S during its fiscal*35 year ended February 29, 1952, for the rental of automobiles. Any amounts which petitioner paid D & S in excess of that amount were in the nature of a distribution of profits from petitioner to its stockholders who were the owners of D & S. Issue 3 Petitioner held a note receivable, taken for an account receivable, for $121,350.96, which was secured by assignment in trust of 19,356 shares of stock in Oil Base, Inc., (hereinafter sometimes referred to as Oil Base) a closely held corporation of California. Upon default of the note in the fiscal period ended February 29, 1952, petitioner received the stock. A value of $4 per share was placed upon the stock by petitioner to apply $77,424 (19,356 shares at $4 per share) to the note and the balance of $43,926.96 was charged off as a bad debt in petitioner's amended income tax return for the fiscal year ended February 29, 1952. Respondent placed a value of $5 per share upon the Oil Base stock and has determined to reduce the bad debt loss claimed by petitioner by the $1 per share additional value which he has placed upon the stock, or a total of $19,356. Oil Base of Compton, California, was incorporated in January 1946, as successor*36 to the business of a partnership which had been operated prior to that time. Its principal business is the manufacture of oil base mud which is a special additive to the mud used in drilling operations. The corporation has maintained since its incorporation a fiscal year accounting period ending on September 30th of each year. From at least 1949 on, Oil Base has generally had approximately 20 stockholders. On February 20, 1948, the corporation resolved to sell 15,000 shares of its stock to employees with the restriction that such stock was to be held in escrow during the length of employment of the purchaser, and that the purchaser-employee was not to sell or transfer his stock in any way without giving the corporation an option for 30 days to buy it at its book value as determined at the last preceding annual audit. The same option existed in the event the employee terminated his employment. The corporation has invariably exercised such option to purchase stock of employees when offered to it. The following schedule reflects information regarding Oil Base stock: Shares ofBookCapital StockValueCash Div.EarningsPer Out-Per Out-Per Out-Out-standingstandingstandingDatestandingIn Treas.ShareShareShare9-30-4636.610None$1.56$ None$ .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.000None1.81None1.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,257None2.41None.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,377None2.83None.429-30-50100,000None4.12.05 Before RAR adj.1.34After RAR adj.1.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,484None4.72.13 Before RAR adj..78After RAR adj..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,484None4.90.40.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,2841,2005.44.25.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,06810,4166.26.251.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,03817,4467.12None.84*37 The increase in outstanding stock from 36,610 shares on September 30, 1946 to 87,257 shares on September 30, 1948, was due primarily to stock dividends of 48,390 shares issued during that period at their par value of $1 per share. No other stock dividends have been declared by the corporation. The net earnings of Oil Base (after Federal taxes) as originally reflected by its books for the following fiscal years were in the following approximate amounts: ApproximateFiscalNet IncomeYear EndedAfter Taxes9-30-49$ 41,7309-30-50133,7689-30-5177,609 As a result of agreed adjustments made by the Internal Revenue Service and the resultant tax thereon, the net income for the fiscal year ended September 30, 1950 was decreased to approximately $128,177 and the net income for the fiscal year ended September 30, 1951 was increased to approximately $84,984. On September 16, 1949, R. V. Perkins, the treasurer of Oil Base, purchased from Oil Base 800 shares of its stock which had previously been unissued for $2,42 per share, at which time the book value was approximately $2.83 per share. On February 29, 1952, the book value of Oil Base stock was $4.94 per*38 share. Its current ratio on that date was 3.38 to 1. Its profit for the 5-month period ended February 29, 1952 (after estimated taxes) was $36,641.91. After the petitioner received the stock it contacted Oil Base about purchasing the stock. On June 11, 1953, Oil Base offered the petitioner $3 a share for the latter's entire holdings. Deely was not satisfied with the offer of $3 a share, and contacted his stockbroker in Dallas concerning its possible sale. He was advised by the broker that because of the nature of the stock the most logical customer would be Oil Base itself. Petitioner declared a dividend and paid same with the Oil Base stock. In 1954, each of the stockholders received his or her pro rata portion of the 19,356 shares. In April and June 1954, all of the stockholders of petitioner except Deely sold their interest in Oil Base, totaling 9,485 shares, to either Oil Base or its officers for $5.50 per share. The initiation for these sales came from one of petitioner's stockholders, Patrick Adamson. In June 1954, the book value of Oil Base stock was approximately $6.25 a share. On September 30, 1954, Oil Base offered to buy Deely's 9,871 shares for $4 per share. Deely*39 felt that this offer was inadequate because the other stockholders had shortly prior thereto sold their stock for $5.50 a share. In the fall of 1955, Deely sold his 9,871 shares of stock to Oil Base for $5.28 per share when the book value was approximately $7.12 per share. The fair market value of the 19,356 shares of stock received by the petitioner in February 1952, on February 29, 1952, was $4 per share. Opinion BLACK, Judge: The three issues involved herein will be discussed in the same order as the Findings of Fact relating to them. Issue 1 The respondent has disallowed certain portions of compensation payments 1 made to two of the petitioner's officer-stock-holders, as deductions from gross income on the ground that they were unreasonable in amount to the extent disallowed. *40 Section 23(a)(1)(A) of the 1939 Code provides for a deduction for business expenses "including a reasonable allowance for salaries or other compensation for personal services actually rendered." Although the three criteria established, viz., are the payments compensation, are they for personal services actually rendered, and are they reasonable, are closely related, the question here is "are the payments reasonable." Whether the payments are reasonable is a question of fact to be determined from all the circumstances; no single factor is decisive. Mayson Mfg. v. Commissioner, (C.A. 6, 1949) 178 F. 2d 115. Deely held 51 per cent of the petitioner's stock and was its president. He was its moving force. In the 2 years involved here, 1951 and 1952, the petitioner had gross receipts of about $1,900,000 and $4,000,000, gross profits of $520,000 and $1,300,000, and net profits of $243,000 and $380,000, respectively, resulting from the sales and servicing of the equipment that was designed and developed by Deely. He received no additional compensation or royalties for the use of his patents. He devoted all of his time to the business, designing and developing equipment, training*41 personnel to use the equipment, selling the petitioner's products and service, and performing other administrative duties. He was traveling about 75 to 80 per cent of the time, adapting the equipment to meet the needs of each particular oil field. Eleanor held about 5 per cent of the petitioner's stock and was its secretary-treasurer. She did the work of a general manager and devoted full time to the petitioner. She was in charge of the accounting department; she had authority to hire and fire office employees, as well as the men in the field; she could write checks without limitation; she made purchases from suppliers; set prices and sold equipment; she was familiar with the petitioner's products and services; and while Deely was away (which was 75 to 80 per cent of the time) she was responsible for the petitioner's operations. The testimony that both Deely and Eleanor were indispensable to the business of petitioner is entirely credible. The fact that the board of directors approved the compensation paid is significant. Ox Fibre Brush Co. v. Blair, (C.A. 4, 1929) 32 F. 2d 42. The stockholders also expressed approval. See Brown-Forman Distillery Corp. v. United States, (Ct. Cl., 1955) 132 F. Supp. 711, 716.*42 There were no dividends paid in either of the 2 years involved, and part of the compensation involved was paid in bonuses that were determined and paid near the end of the calendar year (fiscal year ended February 28). Such factors, although highly significant in some cases, are not of great materiality here since the compensation payments do not bear any relationship to the stockholdings of the parties. See Olympia Veneer Co., 22 B.T.A. 892 (1931). Deely and Eleanor both received substantially less compensation in the years prior to 1951 and 1952. It does not follow that they received excessive compensation in 1951 and 1952, cf. TennesseeConsolidated Coal Co., 15 T.C. 424, 431 (1950), particularly since the evidence indicates that their compensation in the earlier years was low. See Glenshaw Glass Co., 13 T.C. 296, 307 (1949). The respondent contends that the petitioner's failure to show that the compensation paid to Deely and Eleanor is comparable to the compensation paid for similar services by other corporations in the same industry is fatal. Considering all of the other evidence submitted by the petitioner, that contention is untenable. *43 See Mayson Mfg. Co. v. Commissioner, supra. From the evidence in the record we have found that the compensation paid to Deely and Eleanor was reasonable. We hold that it is deductible under section 23(a)(1)(A) of the 1939 Code. The Commissioner's determination is, therefore, reversed. Issue 2 The respondent has disallowed $31,000 of a $52,275.69 deduction claimed as an ordinary and necessary business expense and argues in his brief that it was unreasonable in amount and represented a distribution of earnings. The petitioner is a closely held corporation. It entered into a contract with D & S, a partnership composed of the petitioner's stockholders. The partners' interests in D & S were held in approximately the same proportion as the stockholdings in the petitioner. The sum of $52,275.69 was paid or incurred under the contract as rentals for the D & S automobiles. Of that amount, D & S realized a profit of $29,849.08. The record shows that D & S was a separate business entity and that the respondent's action, which in effect combined the income of the two entities for tax purposes, is not justified. Cf. Seminole Flavor Co., 4 T.C. 1215 (1945).*44 However, the relationship between the petitioner and D & S invites scrutiny; the circumstances require us to determine whether the amount claimed actually represented an ordinary and necessary business expense or whether it was unreasonable and in excess of the amount which the taxpayer was required to pay for the continued use of the property. If the amount was unreasonable and excessive it would not be an ordinary and necessary business expense deductible under section 23(a)(1)(A) of the 1939 Code, Limericks, Inc., v. Commissioner, (C.A. 5, 1948) 165 F. 2d 483. The petitioner sought to sustain its claim by the testimony of two expert witnesses, both of whom were in the automobile rental business in Dallas and also leased automobiles at the same time and under similar circumstances as the rentals involved here. Both men testified on direct examination that the rates charged by D & S under the contract were reasonable and fair to both parties to the contract. The officials of the petitioner also testified that the rates were reasonable and that they were based upon quotations of rates from other automobile rental companies. The respondent did not offer any countervailing*45 testimony. But on cross-examination of the petitioner's expert witnesses he elicited specific rates which were charged by them on similar contracts. In his brief he has projected those rates in a computation based on the petitioner's usage of the rental automobiles. Using those rates the petitioner would have been required to pay an amount ranging from approximately $24,000, as the low, to approximately $40,000, as the high. Petitioner, in its brief, computed the charges based on the rates quoted to the Hughes Tool Co. (that contract was not accepted by the Hughes Tool Co.). At that rate the petitioner would have been required to pay about $47,000. Upon consideration of all of the above factors and the other evidence in the record, we have found as a fact that $40,000 was a reasonable amount and represented what the petitioner should have been required to pay as reasonable rental for the continued use of the property. To the extent that the obligations incurred under the contract with D & S exceeded $40,000, they are not ordinary and necessary business expenses under section 23(a)(1)(A) of the 1939 Code. Our Findings should be given effect under Rule 50. Issue 3 The respondent*46 has determined that the fair market value of 19,356 shares of Oil Base stock, which the petitioner received in partial settlement of a debt which became worthless, was $5 per share when it was received rather than $4 per share as claimed by the petitioner. The question involved is one of fact and the value is to be determined after proper consideration of all relevant facts. Most of the facts regarding Oil Base and the Oil Base stock have been stipulated. The respondent fixed the fair market value of the stock at approximately the same amount as its book value of $4.94 at the time it was received and argues that that should be sustained since the petitioner has not proved a different value. We cannot agree. We think that the facts in the record and the testimony of the petitioner's expert witness substantiates its contention that the fair market value of the stock was $4 and we have so found as a fact. The expert witness, after considering the relevant factors, capitalized the earnings of Oil Base for the year ended September 30, 1951, at a rate of 5 and arrived at a per share value of about $3.90. He testified that in his opinion the fair market value of the stock was between*47 $3 and $4, with $4 being the maximum. He used a minimum and maximum figure in order to account for unknown factors which might affect the value. The respondent argues that we should reject this testimony because the witness did not have sufficient knowledge of Oil Base and based his opinion on financial statements and other data. It is true that the witness did not have an intimate knowledge of Oil Base and Oil Base stock but he certainly had sufficient knowledge so that his opinion should be given weight. In addition to his testimony, the other evidence indicates that the fair market value of the stock was less than its book value. The sales of the stock, except for the sales under the employees' stock plan, between September 1949 and the fall of 1955, were for amounts ranging from.41 to 1.84 below book value. The block to be valued was large, but nevertheless represented a minority interest. Also from the record it appears that the market for the stock was limited to Oil Base and its stockholders. On the basis of all of the evidence in the record, we think that the presumption in favor of the correctness of the respondent's determination has been overcome. The respondent's*48 determination is, therefore, reversed. Decision will be entered under Rule 50. Footnotes1. ↩Secretary-PresidentTreasurerFiscalCarrollL. DeelyEleanorJohnsonYear Ended2-28-512-29-522-28-512-29-52Claimed$96,000$96,000$19,800$20,750Allowed60,00065,0007,5009,000Disallowed$36,000$31,000$12,300$11,750